CLARKSON, J., not sitting.
Two civil actions to recover damages, in the first for personal injury to Robert Luttrell, a minor, and in the second for loss to A. L. Luttrell of services of his son, Robert Luttrell, allegedly resulting from actionable negligence of defendant — consolidated by consent in court below for purpose of trial.
It appears to be uncontroverted that Robert Luttrell, having attained the age of 12 years on 7 October, 1939, suffered injury as the result of the explosion of a dynamite cap, which had been taken by him and his companions on the day before, that is, Sunday afternoon, 21 July, 1940, from a building used by defendant in connection with its mining operations, known as the McKinney Mine, in Mitchell County, North Carolina; that this building, three stories high, is located on a mountain side, approximately 50 feet from a public road — the top story being on a level, or nearly so, with the road; that there is a chute in said building, extending from a point several feet above the ground below the first floor diagonally to the top floor; and that defendant kept dynamite caps in the building for use in connection with its mining operations.
The plaintiffs in their respective complaints allege in part: (1) That agents of defendants, knowing, (1) that dynamite caps were "highly attractive to children," and "extremely dangerous to life and limb when possessed or played with by them," (2) "that large numbers of children including the plaintiff attracted by said mine and building and operations habitually and customarily frequented and played upon the grounds immediately around said mine and building," and (3) "that such children pursuing their childish impulses would likely enter said building and take into their possession some of the shiny and attractive dynamite caps," "negligently, carelessly, recklessly and in utter disregard of the rights and safety of plaintiff, left dynamite caps, which it was utilizing in its said business, loose in said building and plainly exposed to view, and at the same time negligently and carelessly left and permitted the doors and other vents and openings of said building to be and remain unlocked and unfastened so as to permit children to easily enter said building," and that plaintiff and his companions, so attracted to the place, and in accordance with their custom to congregate at said mine *Page 785 
and building for play, and being ignorant of dangerous nature of dynamite caps, and pursuing "the childish instinct natural to children of such tender age," entered said building and one of them seeing "some shiny and attractive dynamite caps plainly exposed to view in said building, took several of them into his possession and divided the same among his playmates including this plaintiff," and that thereafter the plaintiff, while playing with one of said dynamite caps caused same to explode, and to seriously and permanently injure the plaintiff."
Defendant, in answering the complaints, denies the allegations of negligence, and pleads trespass and contributory negligence of Robert Luttrell.
Evidence for plaintiffs in the trial court tends to show these facts:
On Sunday afternoon, 21 July, 1940, Robert Luttrell, accompanied by four other boys, Ed Hice, age 13 years, Charlie Grindstaff, age 11 years, Tommy Burnett and Jack Burnett, returning from Sunday school at Black Mountain Church, went to the premises of the McKinney Mine to play. While there Charlie, Tommy, Ed, and Robert entered the building by way of the chute. Jack did not enter it. Robert testified: "We all went up the chute, one right over the other. We crawled up the chute, on our hands and knees, holding to the side. There were a lot of cracks in the wall and rafters sticking out, and we would stick our toes in the cracks and climb on up." He further testified: "The lower end of the chute is about six or seven feet, maybe eight feet, off the ground, down where the stuff is put in the truck. . . . We climbed up the muck pile and stepped over . . . on to the chute. The end of the chute stuck out . . . We went from the bottom of the chute up to the first floor level. Then we were confronted with an upright partition . . . I climbed over . . . After we got inside we saw a whole big lot of something like tar paper and machinery. We saw something looked like wheels or belt, I believe it was a belt, rolled up, and . . . some machinery." Charlie Grindstaff and Tommy Burnett reached the top floor first, got the dynamite caps and a coil of fuse, and on meeting Ed and Robert after they reached that floor, quoting Robert, "one of them said, `We have got some caps' . . . I knew they meant dynamite caps. . . . They gave me the caps." According to Ed, they also said: "We have got some dynamite caps and we will have some guns."
In this connection Charlie Grindstaff testified: "Tommy Burnett was with me when I got the caps. Tommy got the fuse . . . There was a cupboard in the old building . . . in the extreme end of the room. I don't know how far it was from where we got off the chute back to where we got the caps out of the cupboard. About as far as from here to the back end of the courthouse. . . . When I got up *Page 786 
on that third floor I walked back . . . length of the room to the cupboard. The door to the cupboard was not closed . . . The cupboard is 3 1/2 or 4 feet above the floor level. I had to reach up a little bit, I think, to get to the shelf. . . . The dynamite caps were on the shelf in the cupboard. . . . I saw the little tin box, the lid was not on the box. . . . The fuse was on the shelf above where the caps were . . . We did not go straight back to the cupboard after we got off the chute . . . By the time we went to the cupboard and got back, Robert and Ed had got on the floor . . . where we were . . . Bobby Luttrell was a kind of leader among the boys when he would come down here. I gave him all the caps to divide. I gave them to him on top of the chute, right after I had come back from the cupboard. What I did was to go straight up to the cupboard and get the dynamite caps and fuse and come back down . . . All the caps I got were in the cupboard." Then the boys crawled out through a little door on the side of the building, and "After that . . . crawled on down the muck pile and went on down there . . . drifted on toward the road . . . down the road," and cut the fuse into pieces, and divided the caps and pieces of fuse — Robert getting three and Jack Burnett giving him two.
Robert testified that he put the caps and fuse in his pocket, and went home. Charlie went with him and spent the night, and in his bedroom the next morning before breakfast, failing "to scratch out the contents" of one of them, with a burned match, because it was too blunt, he tried a pin, and the cap exploded, "a big b-o-o-m," causing his injury. Right after this two dynamite caps with fuses inserted therein were found in Robert's bed. He testified: "I don't know how the fuses got in the caps . . . maybe I put them in there but I don't remember . . . when I got the caps they did not have any fuse in them. . . . I don't remember putting fuse in the caps but I guess I must have, but I don't remember. I guess the piece of fuse does fit right into the cap shell, the fuse is about as big as the hole."
Plaintiff further offered evidence tending to show that prior to 21 July, 1940, (1) That dynamite caps had been seen in the building by both Ed Hice and Charlie Grindstaff. Ed Hice testified: "I had seen them on an old belt that was there and in that little cupboard of a thing and scattered around in it. I had seen some over in the floor. I had seen some loose on the shelf, out of the little tin box. The best I can remember the tin box was a kind of red. The box was open. I could see caps in it. It was about six months before this had happened that I had seen them, and had noticed them before that."
Charlie Grindstaff testified: "I had seen dynamite caps in that building before . . . I don't know how long before this time in July that I had seen them on the belt. I saw one or two caps lying around on the *Page 787 
floor and on the belt . . . in the same room where the caps were when we entered in July. . . . I don't believe I saw any caps anywhere that day only on the shelf . . . on the side of the shelf in a box. I could see them standing on the floor. I took about 9 or 10 in my possession."
Plaintiff further offered testimony regarding the children playing around the building. Robert Luttrell testified: "Prior to July 21, the date I was hurt, I had played at this building, . . . several times before, and before that I had worked there too, picking out mica . . . children were in the habit before that time of playing there . . . around the tipple and up on the muck pile . . . just a mountain of muck that you could walk on . . . right close to the building and you could walk up a great big old pile of muck . . . There was a way you could walk up the muck and get on the inside of the building or on the side of the building. I walked up there . . . we played there most every Sunday, this was Sunday afternoon . . . I have never been in this building before on Sunday, but we had played around on the muck pile and around there. I had not been in it before . . . It was on Sunday that I had played around it. I don't know whether any other day or not, I can't remember the days. I had never been in the building before that time."
Ed Hice testified: "We had played at the place before. I do not know how many times we had played there, but I guess we had played there for almost a year. We would play there on Sundays because we all had to work through the week."
Also, Charlie Grindstaff testified: "I had been in the building once before. That was on Sunday. I had never been in the building except on Sunday, nor any other boy so far as I know."
Plaintiff further offered evidence tending to show that the doors of the building were not kept locked, and that there were other ways to enter it than by the chute; that while the mine was in operation, nobody was there that day, nor was any work being done that day; that Mr. Burdett Thomas is the manager in charge of the work and of the building, and that on one Sunday when Ed Hice and other boys were playing at the building, Mr. Thomas came to the mine. Ed testified: "We were on top of the big muck pile when he came up. We were not in the building . . . It was on Sunday. When I saw him he was in the big road that comes right up over the dump. He rode up in the car and backed and parked. He got out of the car, . . . went out to the mine, and we just kept on playing. I don't know who was with him . . . he was not working that day."
Evidence for plaintiff further tended to show these facts: Robert Luttrell, who was born and has resided in Chicago, has during several *Page 788 
summers visited his grandmother and step-grandfather at their home in the neighborhood of McKinney Mine and on the road. that runs by that mine, and was on such a visit at the time of his injury; prior thereto he had attended the public schools in Chicago since he was old enough to go to school, and was in the seventh grade at the time. He had not made the honor roll all through the school course — did not make it a great deal of the time — missed it lots of times. His grades were not always above the average. Two or three times he had taken part in dramatics and plays in school. In one he had taken the part of Alexander the Great, and knew who were such characters in history as Napoleon, Joan of Arc, Theodore Roosevelt, and "people like that," and, according to Charlie Grindstaff, "when he would come down here," he "was kind of leader among the boys." His height at the time of the trial was sixty-seven inches. He had had experience in shooting firecrackers, and knew they exploded. He had shot 22 long shells in a 22 rifle. He had been hunting with a man who had a gun and shot shells. He had played around the mines "with the boys" for several years when he was down here. His grandparents resided "right in the mining section," there being three or four mines right close to the McKinney Mine — where dynamite and dynamite caps were used. He had heard dynamite shooting all around in that community, and knew that he should run, and did run, when he heard the man holler "Fire in the hole." He knew what a dynamite cap is, and that it would explode when fuse is attached to it and lighted — but, he says, he did not know that picking into a cap with a pin would cause it to explode. He testified that the dynamite caps he had were the same kind that Ed Hice shot two Sundays before — he and others having stated that Ed, or some one of the boys with him two Sundays before, had gotten from the building in question a dynamite cap, and had shot it with a "b-o-o-m." He also testified: "I knew that they (the caps) belonged to the people that owned the property in the mill building. I knew they were not mine . . . Yes, I am old enough to know that it was wrong to take property that belongs to somebody else and appropriate it to my own use, but I hadn't thought about it."
From judgment as of nonsuit at close of plaintiff's evidence, plaintiffs appeal to Supreme Court and assign error.
Considering the evidence on this appeal in the light most favorable to plaintiffs, and giving to them the benefit of every *Page 789 
reasonable inference therefrom, we find no error in the judgment below — the challenge to the correctness of which constitutes in the main the debate on the appeal.
The question: Is there evidence of actionable negligence sufficient to take the case to the jury?
In an action for recovery of damages for injury resulting from actionable negligence the plaintiff must show: (1) That there has been a failure on the part of defendant to exercise proper care in the performance of some legal duty which the defendant owed the plaintiff under the circumstances in which they were placed; and (2) That such negligent breach of duty was the proximate cause of the injury, a cause that produced the result in continuous sequence, and without which it would not have occurred, and one from which any man of ordinary prudence could have foreseen that such result was probable under the facts as they existed.Whitt v. Rand, 187 N.C. 805, 123 S.E. 84; Murray v. R. R., 218 N.C. 392,11 S.E.2d 326; Mills v. Moore, 219 N.C. 25, 12 S.E.2d 661;Mitchell v. Melts, post, 793. See, also, Stephens v. Lumber Co.,191 N.C. 23, 131 S.E. 314.
If the evidence failed to establish either one of the essential elements of actionable negligence, the judgment of nonsuit must be affirmed.Mitchell v. Melts, supra.
Also, the principle prevails in this State that what is negligence is a question of law, and when the facts are admitted or established, the court must say whether it does or does not exist. "This rule extends and applies not only to the question of negligent breach of duty, but also to the feature of proximate cause." Hoke, J., in Hicks v. Mfg. Co., 138 N.C. 319,50 S.E. 703; Russell v. R. R., 118 N.C. 1098, 24 S.E. 512;Clinard v. Electric Co., 192 N.C. 736, 136 S.E. 1; Murray v. R. R.,supra; Reeves v. Staley, ante, 573.
In Lineberry v. R. R., 187 N.C. 786, 123 S.E. 1, Clarkson, J., said: "It is well settled that where the facts are all admitted, and only one inference may be drawn from them, the court will declare whether an act was the proximate cause of the injury or not."
Furthermore, it is proper in negligence cases to sustain a demurrer to the evidence and enter judgment as of nonsuit, "1. When all the evidence taken in the light most favorable to the plaintiff, fails to show any actionable negligence on the part of the defendant . . . 2. When it clearly appears from the evidence that the injury complained of was independently and proximately produced by the wrongful act, neglect, or default of an outside agency or responsible third person . . ." Smith v. Sink,211 N.C. 725, 192 S.E. 108, and cases cited. See, also, Boyd v. R. R.,200 N.C. 324, 156 S.E. 507; Powers v. Sternberg, 213 N.C. 41,195 S.E. 88; Butner v. Spease, 217 N.C. 82, 6 S.E.2d 808; Murray v.R. R., supra. *Page 790 
"The degree of care required of persons having the possession and control of dangerous explosives, such as firearms or dynamite, is of the highest. The utmost caution must be used in their care and custody, to the end that harm may not come to others upon coming in contact with them. The degree of care must be commensurate with the dangerous character of the article." Mattson v. R. R., 95 Minn. 477, 70 L.R.A., 503, approved inBrittingham v. Stadiem, 151 N.C. 299, 66 S.E. 128; Wood v. McCabe,151 N.C. 457, 66 S.E. 433, and to like effect in Barnett v. Mills,167 N.C. 576, 83 S.E. 826; Krachanake v. Mfg. Co., 175 N.C. 435,95 S.E. 851; Stephens v. Lumber Co., supra.
Though the extent of the precautions which a reasonably prudent person would take to avoid injury in the case of a child is affected by the child's appreciation of the danger incident to the handling of explosives, and hence, liability may exist in the case of a child of tender years which would not exist in the case of a child of more mature years, it is well settled that one who keeps or uses explosives owes a duty, especially to young children who cannot be expected to know and appreciate the danger, to exercise care commensurate with the danger to prevent injury to children who may have access to, or come in contact with, explosives. Thus it has been broadly stated that it is a breach of duty to leave or to store explosives accessible to children who are lawfully on the premises — or whose presence there should be anticipated. 22 Amer. Jur., 139. See, also, Annotations in 43 A.L.R., 435, 49 A.L.R., 160, and 100 A.L.R., 452.
In the present case there is no allegation or evidence of the existence of any relation between Robert Luttrell and defendant, out of which any peculiar duty arose with respect to conditions in the building where the dynamite caps were stored, as would be in the case of master and servant. The dynamite caps were used by defendant as a legitimate agency in the prosecution of the lawful business of mining in the mountains of Mitchell County. They were stored in a tin box on an elevated shelf of a cupboard placed in the rear of the third floor of a mountain side building in use by defendant in carrying on its mining business, except on Sundays. The defendant had the right to store dynamite caps in such building on its own land. But in view of the explosive nature of dynamite caps it owed a duty to children, who might lawfully go into the building where the dynamite caps were stored, or whom it might reasonably anticipate would do so, to exercise commensurate care in protecting them from exposure to dangers incident to the dynamite caps when improperly handled. Hence, if defendant knew, or was charged with implied knowledge, that children were in the habit of playing in and around the building, the question as to whether it had properly safeguarded the dynamite caps would ordinarily be a question for the jury. But where the *Page 791 
evidence shows that defendant had no actual knowledge that children were in the habit of playing around the building, and where the evidence fails to show that children so habitually played in and around the building, as to charge defendant with knowledge of their usual presence on the premises, it is not charged with duty of anticipating that children would trespass upon its premises, and take and carry away dynamite caps.
While in the case in hand there is evidence that plaintiff and other children were in the habit of playing around the building on Sundays, and that some of them on a few occasions had gone into the building, the evidence is insufficient to show that defendant had actual or implied knowledge of such habit. The only evidence is that when on one Sunday the manager in charge of the work and of the building came to the mine Ed Hice and other boys were on the dump pile on the outside of the building. This is insufficient, as a matter of law, to charge defendant with knowledge that children were in the habit of playing there. Therefore, defendant is not negligent in failing to anticipate invasion of its building by children, who had no right to enter. And, while the place from which the dynamite caps were taken indicates caution and circumspection in storing them, it is immaterial whether defendant had properly safeguarded them.
But if it be conceded that there is evidence of negligence on the part of defendant in storing dynamite caps in the manner and under the circumstances shown in the evidence, was such negligence the proximate cause of the injury to plaintiff, Robert Luttrell?
The answer is "No," as in Stephens v. Lumber Co., supra.
The injury to plaintiff here, as there, did not occur in defendant's building, while he and the other boys were in the act of taking the dynamite caps here, powder there, but here it occurred after plaintiff had carried them down the road for division with the others, and had divided them, and after he had carried a part of them home and kept them all night, and not then until he undertook to remove the contents of one of them by picking in it with a pin. The explosion of the cap was not caused by any act of omission or commission of defendant. Too, it was the explosion of the cap and not its presence in the defendant's building, or in the manner in which it was stored, that caused the injury. If the cap had remained in the box on the shelf of the cupboard in the back of the building on the third floor, where defendant had stored it, and where defendant reasonably contemplated it would remain, no harm would have come to plaintiff. Further, if plaintiff, Robert Luttrell, had been an adult, no contention could or would be made that his injury was caused by act of defendant, or that defendant is liable to him therefor. His injury was due to his own wrongful act in taking and carrying away the dynamite caps, and to his own carelessness in picking *Page 792 
into the cap with a pin. Hence, if defendant were negligent in storing the dynamite caps in the building, the connection between such act on the part of defendant and the injury to plaintiff was broken by an intervening cause, to wit, the act of plaintiff. Therefore, unless it can be held that the plaintiff, Robert Luttrell, by reason of his age, cannot be held in law responsible for his acts in taking the dynamite cap and exploding it, plaintiffs' contention that the negligence of defendant, if such be conceded, was the proximate cause of the injury to Robert Luttrell, cannot be sustained.
While Robert Luttrell says that he did not know that a dynamite cap would explode when its contents were picked with a pin, the evidence manifests his knowledge of the dangerous nature of dynamite caps, and his familiarity with their use. Furthermore, the evidence shows him to be at least of average size and intelligence for a boy of his age — not quite thirteen years. The evidence shows him to be of such age and intelligence as to know and understand that the dynamite caps did not belong to him, and, even though he says that he did not think of it at the time, he admits that he knew it was wrong to take property of others, and to appropriate it to his own use.
"Notwithstanding the fact that the person injured is a child, nevertheless, to impose liability, defendant's act must have been the proximate cause of the injury. So where explosives are wrongfully carried away from the place in which they are stored, by children capable of understanding the wrongful nature of their act, the negligence in keeping or storing cannot be regarded as the proximate cause of a subsequent injury to the child or other children by their use, where defendant has done nothing to invite or provoke the act of the child and there is nothing in the circumstances which would cause it to be foreseen. 25 C. J., 187," quoted in Stephens v. Lumber Co., supra, where cases are cited. Such is the case in hand.
Other assignments are found to be without merit.
The judgment below is
Affirmed.
CLARKSON, J., not sitting. *Page 793