## BEASLEY v. UNITED STATES.

## BEASLEY et al. v. UNITED STATES.
### Civ. A. Nos. 1901, 1902.

United States District Court
E. D. South Carolina,
Charleston Division.

Dec. 23, 1948.

J. C. Long, Arthur Rittenberg, and Thomas P. Bussey, all of Charleston, S. C., for plaintiffs.

Ben Scott Whaley and Russell D. Miller, both of Charleston, S. C., for defendant.

WARING, Chief Judge.

The two above entitled cases are brought against the United States under the Federal Tort Claims Act, Title 28 U.S.C.A. § 931 et seq.,[1] The first is brought on behalf of William R. Beasley, a minor, by his Guardian ad Litem, for personal injuries. The second is brought by J. O. Beasley and Martha R. Beasley, parents of the said William R. Beasley, for loss of services, expenses of medicines, medical treatment, hospitalization and other items of damage. The two cases were heard together since they arise out of the same state of facts.

The cases are claims against the United States for damages and injuries suffered by William R. Beasley, a child of the age of 10 years on April 1, 1947, as a result of the explosion of powder on the United States' Government Quarantine Reservation situate on James Island, Charleston County, South Carolina. The Quarantine Station is owned by and under the supervision and control of the United States; the officer in charge, then and now, being Dr. Joseph Bolten, medical officer in charge. Dr. Bolten has been in charge of the station since January 31, 1946.

It appears that a number of the officers and employees of the Quarantine Station reside upon the premises: Among others, Dr. Bolten and his wife, who occupy the medical officer's residence; J. O. Beasley, the chief clerical administrative assistant, the chief official in charge next to the medical official; and Marion L. Burn, a pilot. The plaintiff, William R. Beasley is the son of J. O. Beasley and lives with his parents. Marion L. Burn has a family, including a son Marion L. Burn, Jr., who is and was at the time of the explosion a student at the Citadel, a South Carolina Military Academy, located in Charleston. It appears that the last named young man, Marion L. Burn, Jr., with the help and assistance of a friend and fellow student of his, Howard R. Jacobs, Jr., built a small cannon, somewhat similar to a harpoon gun, which was referred to in the testimony as a toy cannon. It was some two or three feet long and was made of a brass cylinder surrounded by a cast iron ring and molten lead poured between the two so as to reinforce and protect the brass barrel. This toy cannon was used by the young men for firing charges and shooting small projectiles. They used a propulsive charge of black powder ignited by a spark created by a shot gun shell. It appears that this cannon had been in course of construction over a considerable period of time and had been fired fairly frequently, perhaps as many as two dozen times. Apparently, there was no concealment of this gun and its use was known to many of the persons living or employed on the station, including young Burn's father and young Beasley's father. Dr. Bolten disclaims any knowledge of the gun but various witnesses state that they had frequently heard explosions as of firing but as there was considerable hunting and target shooting in the vicinity no particular attention had been paid to it. The young men who operated the cannon testified that they had obtained the powder for the charges from an old Civil War shell that had been dug up, probably on Morris Island in this county, and had been de-activated and taken apart in the rear of the grounds of the Citadel by them and some of their associates. This information had been imparted to Marion L. Burn the pilot.

The Quarantine Station, being under the Public Health Service, the public may be admitted or not as directed. Certain parts of the grounds are supposed not to be visited, but generally speaking, the place is open during the daytime and visitors are allowed to go about and wander around the grounds. Considerable numbers of visitors go there since it has an excellent vista of Charleston Harbor, the City of Charleston, Sullivans Island, Fort

[1] In 1948 Judicial Code, 28 U.S.C.A. §§ 1291, 1346, 1402, 1504, 2401, 2402, 2411, 2412, 2671–2680.

Moultrie and particularly Fort Sumter. The site of the station is historically interesting since it was the location of the original Fort Johnson and there are remnants of buildings and relics of the War Between the States. There is one large cannon which was used by the Confederate forces in the Civil War and which is placed as an ornament and monument near the waterfront and immediately opposite the medical officer's residence. This old cannon has a length of approximately nine feet, and an interior muzzle diameter or bore of ten inches. It is said to have been originally a smooth bore gun but was later rifled. On April 1, 1947, it had inserted in its muzzle an old shell of the type that had been used to be fired in it, the point or nose of this shell being approximately even and flush with the muzzle of the gun. The gun was not mounted on any carriage but was lying on supports on the ground and had been silvered or painted with aluminum paint. Some plastic material had been put over the nose of the shell. It is uncertain how long the shell was in the muzzle of the gun but one witness testified that he recollected when there was nothing of this kind there since they had used the empty gun barrel to stow the post flag when it was hauled down in the evening. There were a number of shells of similar character lying on the ground near this gun some years ago but owing to the fact that visitors and tourists came to the spot frequently and it was reported that one or more of the shells had been taken away, the medical officer who was then in charge (one of Dr. Bolten's predecessors) had the shells stored away under the medical officer's house and presumably the one which we have discussed above was placed in the muzzle of the gun in the position where it was on the day of the explosion.

And so we now go to the day of the explosion which caused the death of one young man and the maiming of another. It was on April 1, 1947, that young Jacobs came to the Quarantine Station to visit his friend Marion Burn, Jr, (whose nickname was "Sonny" and was so called by most of the witnesses). They had conceived the idea of obtaining powder for their toy cannon by opening up the old shell which they had seen in the mouth of the Confederate cannon. In the afternoon of that day they proceeded to attempt to remove the fuse from the nose of the shell. According to the testimony they determined that the fuse had been corroded and could not be unscrewed and they proceeded with various tools to try and pry or pick it out. Finding this ineffectual in its then location, they determined to remove the whole shell and take it over to a more convenient place where they could work on it. While they were working on this shell, Dr. Bolten, the medical officer in charge, came out of his house and saw the young men. His testimony and theirs is approximately the same as to what happened. They state that he accosted them and asked what they were doing and they told him they were attempting to de-activate the shell and that he asked in what appeared to them to be a jocular manner whether they knew they might be arrested for taking or hurting government property and they replied, "No," and he stated, "Well, you had better be careful." Perhaps it would be best to quote the exact language of Dr. Bolten, himself:

"Q. When you came out of your quarters, did you notice any one with respect to the cannon? A. Two boys.

"Q. Did you recognize them? A. Sonny Burn and Howard Jacobs.

"Q. Describe to the Court what took place. A. I came down the steps, walked over to the gun and said, 'Boys, what are you doing?' They said they were defusing the shell. I said in a joking manner, 'Don't you know you can be arrested for defacing government property?' They replied that no they didn't. I said, 'Be careful whatever you do.' Then walked away.

"Q. At that time did you see a wagon or cart which has been described as being a part of the government property over there? A. No, sir.

"Q. Did you see any tools? A. No, sir.

"Q. Will you state whether or not you saw any shell on the ground? A. No, sir.

"Q. State whether or not to the best of your knowledge the shell was still in the

cannon? A. As far as I know the shell was still in the cannon because I did not see anything on the ground.

"Q. Will you tell us whether or not you anticipated, as a result of what they said to you, that the shell would be removed from the mouth of the cannon? A. No, sir. It was my understanding that they were taking the fuse out and nothing else. They said that was what they were going to do.

"Q. What did you think with reference to the fuse? A. Well, I didn't know. They were students at the Citadel and I thought possibly they were doing some experiment."

So it is clear that Dr. Bolten was aware that these two young men; both minors, were at work on a shell and whether they said "defusing" or "de-activating," either explanation would certainly carry to any normal mind the impression that they were working with an element that might explode and were attempting to render it harmless. Dr. Bolten says that he had no information or knowledge of their use of the cannon and that he did not know what they were doing to this shell and didn't think it dangerous. And so he walked away and took no further concern and knew nothing of what happened thereafter until after the explosion. A witness, Mrs. Nungezer, testified that Mrs. Bolten, the doctor's wife, had seen the boys take the shell out of the cannon and that she had communicated this to her husband, who stated he would attend to it later, that being a short time before the explosion. Both Dr. and Mrs. Bolten deny that this had taken place or that this information had been communicated to Mrs. Nungezer.

But to go back to the happenings after the doctor had left the boys working on the shell. Finding it difficult to remove the fuse, they determined to take the shell out of the gun. They did this, but as it was heavy, weighing some 200 pounds, they went to one of the buildings, got out a little cart which consisted of a low wooden platform on wheels, took it near the side of the cannon and got the shell upon it. They then rolled this apparatus along the walk-way in open sight of the doctor's house, the office, the hospital building and the work shops, around the head of the wet basin and onto the boat house, The Quarantine Station property is quite open and this performance could easily have been seen from the residence, office or any of the work shops or by any officials or attendants around the place if they had happened to be anywhere in the general working quarters of the property. The boys testify that when they reached the boat house it was their intention to hoist the shell up where they could better get at it and continue their work of removing the fuse, so as to get at the powder in the shell. They state that they met a workman employed by a construction company which was doing some work on the basin and that he suggested that he would drill a hole at the side of the fuse and that would be much easier. They testify that they thought this dangerous, but the workman did not agree with them and went ahead using an electric drill belonging to his employer and drilled a hole which gave them access to better obtain the powder. The name of this workman was not known to any one of the witnesses. The young men then hoisted the shell up by chains in the work house using, of course, government appliances and property and spread a tarpaulin on the ground under the shell and extracted some of the powder by wires or other instruments. They got out enough to use in the toy cannon for one shot and then determined to make further experiments in the ordnance manufacturing field and started to work to manufacture a projectile which was to contain powder, be propelled from the cannon and explode when it hit its target. While they were busy about this, two younger boys came in and being interested, set about getting more of the powder out of the shell which was hanging there over the tarpaulin. These younger boys were George Nungezer, Jr., age fifteen years and William R. Beasley (the plaintiff herein) who lacked just about one month of being eleven years old. It appears that these two youngsters wanted to work on the shell and get some of the powder also. The older boys made no objection. Nungezer and Beasley ran some instruments into the hole and loosened

some powder and one of them, George Nungezer, Jr., is said to have been tapping on the shell to loosen more of the powder. As to exactly what happened then no one knows; excepting that suddenly there was a violent explosion. The two older boys testify that they were propelled out the building and for a few moments were unaware of what had happened. And when they came to, they saw smoke issuing from the building, some of its inside being on fire and the two young boys were lying therein. It was seen that both the young boys were seriously injured, help was called for, Dr. Bolten was notified and came and rendered first aid. The government station wagon was brought up, the boys were put in and taken to Roper Hospital in the city of Charleston. Young Nungezer died shortly thereafter. Young Beasley suffered severe burns about the face and body and particularly on his leg and groin and had severe wounds with severed arteries rendering it impossible to save his right leg. This leg was amputated about a week later, the amputation being approximately halfway between the groin and the knee, leaving perhaps one-third of the upper leg. The burns and injuries were of such a severe nature it was doubtful for some time whether Beasley's life would be spared but eventually he recovered, having been confined in the hospital about six months in all. He received numerous blood transfusions, (at least forty, one of the doctors said) and underwent repeated operations for skin grafting. According to the medical testimony, portions of skin of varying size were taken from other parts of his body for grafting purposes, some of it having to be done several times. Fortunately, however, the treatment seems to have been successful and young Beasley is now out and about. Of course, he suffered greatly from many painful burns, bruises, cuts and wounds. The burns and burnt powder from the explosion caused damage to both of his eyes. He has been under treatment for this and although he has made fair recoveries, he appears to have definite impairment of his vision. There is no testimony of his eyes ever having been examined before the injuries and he and his family state that he had the usual normal eyesight. The specialists who treated him, one of whom treated his eyes and the other of whom made an examination at the request of the government, were not far apart in their estimate of his injuries, one estimating his loss of vision in the following percentages: right eye— 8.5% loss, left eye—4.3% loss. The other oculist gave the same estimate, stating that the defective vision could and should be corrected by the use of glasses and estimated that with the correction by glasses he would place the estimate of loss at the smaller figure namely, 4.3%. The surgeon who treated the injured boy testified in detail as to his condition and the progress made as did likewise an orthopedic specialist employed by the government to make an examination. Their findings were substantially the same; the plaintiff has lost his leg as above detailed, has been fitted with an artificial leg, which as yet he does not use very satisfactorily and complains of considerable pain in the stump of the leg. He gets around rather well on crutches and they believe that the condition will improve and he will eventually become more adept in the use of the artificial leg, although, of course, adjustments from time to time will have to be made in this and new artificial legs obtained as he grows. There is also testimony that as a result of the loss of the leg the young boy has suffered structural changes, which do, and probably will continue to, affect his spinal structure. The orthopedist made an estimate of the permanent disability at between 35% and 50%. The life expectancy of the plaintiff at the time of the injuries was 48.1 years according to mortuary tables, see S.C. Code of Laws 1942, Section 735.

The foregoing is, I think, a very fair summary of the testimony. And it is clear to see that the officials in charge, namely Dr. Bolten, the medical officer in charge; J. O. Beasley, Administrative Assistant, and Marion L. Burn, pilot, were, or at least some of them were, cognizant of the fact that visitors could come and go in and about the premises almost at will. They also knew that minors resided on the premises, and had friends and visitors, who were also minors, and that some of

these had manufactured and used a dangerous appliance: that they used in it powder obtained from old shells: that old shells had been allowed to lie around the premises and that at least one was kept in the mouth of the Confederate cannon: that no investigation was made of these potentially dangerous articles: that these young boys played with dangerous weapons; and that they had free access into the buildings and work shops, including the boat house on the premises. These officials, or certainly some of them, with this knowledge in mind, made no effort to supervise or correct these excesses and dangerous acts. It is noted that some years ago one of the officers in charge determined that children on the premises should not go into the buildings or work shops. But instead of issuing an order to that effect and requiring the adults under his direction to enforce the same, he wrote a letter addressed to the children themselves and caused this to be delivered to them. The letter is in evidence (Exhibit L.) and strikes me as being a silly, sentimental, epistle which rather than having the effect of keeping children out of the buildings and work shops might make them think it desirable to use them. At least some of the present officers had knowledge of this letter but nobody there did anything to keep the children out. The pilot, Marion L. Burn, who incidentally was the man in charge of the grounds the day the explosion took place, knew of the making and firing of the cannon, he knew that powder therefor had been obtained from an old shell, he knew the boys were working in the boat house that day, and according to some of the testimony, he actually sent young Beasley over there. J. O. Beasley knew of the firing of the cannon and he says that he had warned his child to keep away from it. But in his official capacity he took no action to prevent its use and did not report it to his superior. Dr. Bolten, the top official in charge, says he did not know of the cannon but he distinctly admits that he saw two young men, Howard Jacobs and Sonny Burn, both minors, working on a shell in the old cannon and that he was informed by them what they were doing with it and he told them to be careful. This corroborates the story told by the young men themselves. And all three are agreed as to the substance of the testimony. It is hard to conceive of a responsible official in charge of a government station casually walking away and leaving two minors tampering with and trying to get through a fuse into a shell. If Dr. Bolten was ignorant of what was meant by defusing or de-activating a shell it was ignorance so crass as to be evidence of gross negligence by him and thereby his superior the United States.

And so it is clear that officials in charge of the Station were on notice of dangerous operations in regard to explosives being carried on by minors. As to how much of the rest of what happened leading up to the explosion was actually known to these officers is difficult to ascertain and the government takes the position in this case that the explosion itself was something that was occasioned from these later acts, and that the government must not be held liable for acts of negligence committed by the boys themselves and not resulting from acts of commission, omission and negligence of the officials themselves. But it seems to me that one thing naturally follows another and it reminds one of the famous old Squib case (Scott v. Shepherd, 2 W.Bl. 892 (in 1773) and also an interesting discussion of same in Sandel v. State, 115 S.C. 168, 176, 104 S.E. 567, 13 A.L.R. 1268). A train of circumstances was started right there in the presence of Dr. Bolten. Almost any responsible individual would realize that when two youths attempt to defuse a shell it is reasonable to expect that you will soon have an explosion. The failure of Dr. Bolten to stop this operation almost inevitably led to these youths going through, removing the shell and taking it on a government cart to the boat house, which they had frequently used and which appears to have been used at will and with the acquiescence of officials. The next step was to work further on the shell and when this was being done by a group of minors, not experts, unauthorized but allowed by their adults and superiors, the resulting explosion was not at all an unexpected culmination of a series of dangerous

acts. The officials, having allowed these boys to start on this dangerous mission, must be held responsible for the unfortunate results which they should have foreseen and prevented. I am of the opinion that the officers' acts of negligence above referred to were chargeable with this explosion and that the government is responsible therefor.

"If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable." Restatement of the Law of Torts, Volume II, Negligence, page 1173, Sec. 435.

"It therefore may be said from a resume of the authorities that to constitute negligence creating a liability for the damages to the respondent, it is not necessary that the appellant should have contemplated the particular event which occurred. It is enough that it should have contemplated the probable happening of some accident of this kind, involving bodily injury to others which ought to have been guarded against; and the doer of the act cannot shelter himself behind the defense that the actual consequence was one that rarely follows from that particular act. He may be held liable for anything which, after the injury is complete, appears to have been a natural and probable consequence of his act or omission." Tobias v. Carolina Power & Light Co., 190 S.C. 181, 187, 2 S.E.2d 686, 688.

"(19) * * * It is universally agreed that the mere fact that the intervention of a responsible human being can be traced between the defendant's wrongful act, and the injury complained of will not absolve him. On the contrary the general rule is that whoever does a wrongful act is answerable for all the consequences that may ensue in the ordinary course of events, though such consequences are immediately and directly brought about by an intervening cause, if such intervening cause was set in motion by the original wrongdoer, or was in reality only a condition on or through which the negligent act operated to produce the injurious result. Any number of causes and effects may intervene between the first wrongful cause and the final injurious consequence; and if they are such as might, with reasonable diligence have been foreseen, the last result, as well as the first, and every intermediate result is to be considered in law as the proximate result of the first wrongful cause. The question always is, was there any unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? The test is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies which might arise." 22 Ruling Case Law 134, 135, 136.

The foregoing quotation is quoted and relied upon as the law of South Carolina in Pfaehler v. Ten Cent Taxi Co., 198 S.C. 476, 485, 18 S.E.2d 331.

In the case of Horne v. Southern Railway Co., 186 S.C. 525, at page 537, 197 S. E. 31, 36, 116 A.L.R. 745, the Court says:

"Liability for negligence is not predicated upon the necessity that the wrongdoer should foresee that an injury would result from his wrongdoing. It is sufficient that in view of all the circumstances, he should have foreseen that his negligence would probably result in injury of some kind to some one. Sandel v. State, 115 S.C. 168, 104 S.E. 567, 13 A.L.R. 1268.

In the case of Sandel v. State, 115 S.C. 168, at page 181, 104 S.E. 567, at page 571, 13 A.L.R. 1268, the Court says:

" * * * for instance, it is not necessary to show that a person charged with negligence should have foreseen the particular consequences or injury that resulted. It is enough that he should have foreseen that his negligence would probably result in injury of some kind to some one. 29 Cyc. 493; 22 R.C.L. 125."

In the presentation of this case there was considerable argument of the doctrine of "attractive nuisance" and many cases were cited as to liability to minors under this doctrine. I think it unnecessary and unprofitable to review these. Because I

think that this case goes far beyond and is not dependent upon the doctrine of attractive nuisance. Young Beasley was not a trespasser. He resided with his family upon the Quarantine Station premises. The same is true of young Burn. And the other two boys, Jacobs and Nungezer were invited guests of the families of Beasley and Burn and were there with the full knowledge and acquiescence of the responsible officials of the Quarantine Station. In no sense could any of them be called trespassers and the government and its officials owed to them at least ordinary care and protection. The government argued that the shells on the premises and the appliances which were used could not be included in the attractive nuisance definition. It may be said that it is hard to imagine a more attractive plaything than an explosive or an appliance used in connection with explosives to minors and young boys. But in view of many other facts I think it unnecessary to pursue this line of discussion further.

█ It was urged that the plaintiff, young Beasley, was most negligent and, even if the government were negligent, Beasley's acts contributed to the injuries as the proximate cause. But contributory negligence by a minor of tender years is not a defense. There are many cases in this state outlining the law as to contributory negligence by a minor. It is unnecessary to discuss the various cases that have been cited to me and with which I am fairly familiar. The whole matter is succinctly and well summed up in an able opinion by Mr. Justice Cothran in Cirsosky v. Smathers, 128 S.C. 358, 122 S.E. 864. See also Watson v. Southern Ry., 66 S.C. 47, 44 S.E. 375; Sandel v. State, 115 S.C. 168, 104 S.E. 567, 13 A.L.R. 1268, 38 Amer.Jur. p. 926, Negligence Sec. 240; and case and notes in 13 A.L.R. 1268 and 23 A.L.R. 670.

█ As a further defense, it is suggested that young Beasley's father, J. O. Beasley who occupied an important position, being practically second in command, upon the Station, had children, knew of the situation, the use of dangerous appliances, the location of the shells and other facts, that would make him chargeable with an equal degree of negligence as the other officers. I am disposed to believe that this claim is in great part true. The father states that he did know of the firing of the cannon and did warn his son about it, he denies knowledge of most of the other things, though he lived and worked upon the premises and must have known of the shells, of the acts of the young men and boys in firing their explosives, using the boat house, and other places and generally what was going on. But even assuming that he is chargeable with negligence, this would not bar recovery by his minor child. The case of Cirsosky v. Smathers, supra, and other authorities heretofore cited distinctly hold this.

█ And so, upon the testimony, as outlined and discussed, I hold that the government is responsible and find for the plaintiff.

But there is another and separate ground for a finding which should be discussed, namely the matter of admissions made on behalf of the government irrespective of the testimony heard by me and discussed above.

The plaintiffs' attorneys under authority of Rule 36 of the Federal Rules of Civil Procedure for the District Courts, 28 U.S. C.A., served and filed requests for admissions relating to a number of topics. Thereafter and within the 10 days provided by the statute, the United States Attorney in person applied to and obtained from the Court an Order dated July 7, 1948 extending the time for answering these requests until August 2, 1948. On this last named day the United States Attorney served and filed a paper entitled Answers to Requests for Admissions. This paper contained no verification but was merely signed by the United States Attorney. At the conclusion of the presentation of testimony on behalf of the defendant, plaintiffs' attorneys inquired whether these Answers to the Requests for Admissions represented the entire admissions and the answer being in the affirmative they then moved the Court to disregard the papers so filed and to rule that the questions propounded in the Requests be deemed admitted. This raises an interesting question of procedure.

Rule 36 is as follows:

"(a) Requests for Admission. After commencement of an action a party may serve upon any other party a written request for the admission by the latter of the genuineness of any relevant documents described in and exhibited with the request or of the truth of any relevant matters of fact set forth in the request. If a plaintiff desires to serve a request within 10 days after commencement of the action leave of court, granted with or without notice, must be obtained. Copies of the documents shall be served with the request unless copies have already been furnished. Each of the matters of which an admission is requested shall be deemed admitted unless, within a period designated in the request, not less than 10 days after service thereof or within such shorter or longer time as the court may allow on motion and notice, the party to whom the request is directed serves upon the party requesting the admission either (1) a sworn statement denying specifically the matters of which an admission is requested or setting forth in detail the reasons why he cannot truthfully admit or deny those matters or (2) written objections on the ground that some or all of the requested admissions are privileged or irrelevant or that the request is otherwise improper in whole or in part, together with a notice of hearing the objections at the earliest practicable time. If written objections to a part of the request are made, the remainder of the request shall be answered within the period designated in the request. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party deny only a part or a qualification of a matter of which an admission is requested, he shall specify so much of it as is true and deny only the remainder."

It will be noted that the rule specifically states that "each of the matters of which an admission is requested shall be deemed admitted unless * * * the party to whom the request is directed serves upon the party requesting the admission either (1) a *sworn* statement * * * or (2) written objections." (Emphasis added.)

■ There is no claim that written objections as contemplated by the rule were made so that the issue joined is whether it is necessary that the statement served shall be *"a sworn statement."* In this case a statement was served admitting some and denying others of the requests. But the plaintiffs' attorneys take the position that the rule must be strictly obeyed and that a statement that is not sworn to does not comply with the rule and will be treated as no statement at all and therefore an admission of the truth of the inquiries. Of course, the Court and all the parties are bound to follow the Rules of Civil Procedure just the same as they would be required to obey a statute.

On behalf of the government it is contended that this is an immaterial variation and that the plaintiffs waived the requirement of the sworn statement by not raising this question before or calling for the statement to be verified or making some motion in regard thereto. But why should the burden of following the rules and practicing law according to the precepts laid down by the Supreme Court of the United States be shifted to the shoulders of opposing counsel? As I understand it, the United States Attorney is the person who is supposed to protect the interest of his client the United States and the attorneys for the plaintiffs have no duty in regard thereto. The rule is very specific. The rule is very plain and it distinctly states that unless within the specified period, which may vary only by allowance of the Court, such a "sworn statement" is filed, that each of the matters in the requests *"shall be deemed admitted."*

In the discussion of this rule at the Institute on Federal Rules held in Cleveland, Ohio, in July 1938, Professor Sunderland, a member of the Advisory Committee of the Supreme Court discussed this rule and pointed out its terms and in connection therewith he states:

"The usual statute or rule on admissions requires affirmative action to constitute the admission, but under this rule affirmative action is required to avoid the admission. There must be, therefore, a sworn statement specifically denying the facts which the other party requests should be admitted or the admissions will be deemed to have taken place. * * *"

The foregoing is quoted with approval in an opinion by District Judge Moscowitz of the Eastern District of New York in the case of Walsh v. Connecticut Mutual Life Ins. Co. D.C., 26 F.Supp. 566, 572. And in that case the Court discusses and holds that these rules, including Rule 36, mean just what they say and must be followed. It is true that in the Walsh case the so-called answer was verified but since a large part of it really failed to answer the requests but stated that the requests were improper and the plaintiff refused to answer certain of them, the Court holds this is in effect a failure to answer and that failing to answer in conformity with the rule is an admission. And it is pointed out in that same case that Rule 37 deals with the enforcement of Rule 36 and is based entirely upon the ncesssity of a sworn answer being made to the requests.

To my mind the provision that the answers shall be verified is not a mere technicality and the failure to comply strictly with the requirement is not a mere oversight which can be waived or brushed aside. It is a very important and vital part of the procedure. The admissions or denials stand in the same relation to the case that sworn evidence bears. And Rule 37 shows that if improper Answers are made the party may be penalized. In order to warrant the Court imposing such sanctions it must be sure of the definiteness of the answers and therefore it is important that they be sworn to so that the party is definitely bound. And, of course, a further and more potent reason is that all statements in these Answers are to be treated on an equality with sworn testimony and should therefore likewise be under oath. The statutes punishing perjury are enacted for the purpose of penalizing the giving of false testimony in Court. They would not apply to false statements in admissions if these last were not verified.

The rules of practice were first adopted and put in force in 1938. Years were given to their preparation and they were revised many times and submitted and resubmitted to committees, conferences, councils and various gatherings and then adopted and promulgated by the Supreme Court. And again the Committee appointed by the Supreme Court made another study of the rules and after some years of trial and use, some modifications and amendments were suggested and adopted. The rules may therefore be said to be well seasoned with use and consideration. Rule 36 is not a new provision and practitioners in the Federal Courts, including United States Attorneys, are presumed to be familiar with the rules and to follow them. These rules are applicable to cases under the Federal Tort Claims Act and are specifically referred to in Title 28 U.S.C.A. § 932.[2]

These views are sustained by a case considered and passed upon in the Fourth Circuit. In the case of Bowles v. Batson, D.C., 61 F.Supp. 839, plaintiff served upon defendant a Request for Admissions and the defendant filed an Answer thereto which was not verified and the plaintiff filed a motion for summary judgment under Rule 56, one of the grounds being that the requests were deemed admitted because of the failure to serve such sworn statement. Honorable C. C. Wyche, Judge of the Western District of South Carolina granted a summary judgment and in passing upon the matter said: (61 F.Supp. at page 843)

"The defendant did not comply with the provisions of the Rule 36, and therefore, the facts set forth in plaintiff's request for admissions for the purpose of this case are deemed admitted."

The case was appealed and heard in the Circuit Court of Appeals for the Fourth Circuit. This latter court affirmed the decision of the District Court in an opinion reported as Batson v. Porter, 4 Cir., 154 F.2d 566. It is pointed out there that the District Court was fully warranted in giving a summary judgment for several reasons, one of which was that the requests for admissions were deemed admitted since a sworn statement was not filed.

---

[2] In 1948 Judicial Code, see 28 U.S.C.A. § 1346.

Judge Soper speaking for the court says 154 F.2d at page 568:

"The facts upon which the summary judgment was based are set out in the complaint and in the answers made by the defendant to the plaintiff's request for admissions under Rule 36(a) of the Rules of Civil Procedure. As pointed out in the opinion of the District Court, the matters for which admission is requested under this practice are deemed admitted unless a sworn statement is filed in which they are specifically denied or specific reasons are given why they cannot be truthfully admitted or·denied."

■ In consideration of all of the foregoing I feel that in the case at bar, I am warranted in disregarding entirely the answers filed to the Requests for Admissions since these were not verified and I must accept as admitted the statements made in the requests.

■ It is suggested that it may be a hardship that the government should be penalized because its local representative fails to follow the technical rules of law, but it seems to me that this is no more to be excused than the failure to protect the government's interest by any other official or employee. If a government employee driving a government truck fails to follow the rules of the road or to operate his vehicle in a prudent, careful and intelligent manner, his employer the government is held responsible. If the official in charge of a government reservation leaves explosives or other dangerous instrumentalities around where the public visits and is invited, his employer the government is held liable. And so if the United States Attorney fails to follow the rules of law and protect his client, the client is bound to pay for such an oversight.

So now considering the requests for admission of facts admitted, it is proper to summarize them and see just what facts they cover. The facts deemed admitted are as follows:

At the time of the explosion on April 1, 1947, Joseph Bolten was the medical officer in charge of the United States Quarantine Station where the explosion took place, and prior to the explosion received information from his wife that a shell had been removed or was being removed from the old Confederate War Cannon by some boys and he took no action to prevent this being done or to prevent the boys from continuing to handle the shell. He also had knowledge that old shells had been left unprotected on the Quarantine Station and did not investigate or cause an investigation to be made to determine whether they were dangerous or whether they had been de-activated. Dr. Bolten's predecessors in office had knowledge that old shells had been left unprotected in various places on the Quarantine Station and made no investigation or caused any investigation to determine whether they were dangerous or whether they had been de-activated. Prior and up to the time of the explosion the Quarantine Station was open to the public between sunrise and sunset and the public constantly visited the same as sight-seers and visited the site of the old Confederate War Cannon and children were allowed to play around it and no effort was made to require any of them to stay away from this cannon or to prevent persons from tampering with it. Marion L. Burn was the Pilot on the Quarantine Station on duty at the time when the explosion took place, had keys to the boat house and knew that his son Marion L. Burn, Jr. was in the boat house prior to the explosion and that his son and Howard R. Jacobs, Jr. were in the boat house tampering with a shell which they had removed from the old Confederate War Cannon. The said pilot spoke to the plaintiff a short time before the explosion and directed the plaintiff and accompanied him to the boat house where the other boys were engaged as above stated and he, the said pilot, was responsible for opening and closing the boat house and allowing the same to be used by the aforesaid boys and knew how it was being used. The said pilot heard the report made by Mrs. Bolten to Dr. Bolten and took no occasion to prevent the boys from handling the shell which had been removed from the mouth of the old Confederate cannon and transported to the boat house, where the two boys, Marion L. Burn, Jr. and Howard

R. Jacobs, Jr. extracted some of the explosive powder from the shell. Marion L. Burn was a pilot for about nine years prior to the time of the explosion and it was among his duties to observe generally what was going on and to report to his superior any unauthorized conduct or menaces to the safety of persons or property and he had full knowledge that Marion L. Burn, Jr. and Howard R. Jacobs, Jr. had built one or more homemade cannons, had been picking up shells at or near the Quarantine Station, had extracted powder from the said shells, had fired their homemade cannon on or near the Quarantine Station, and he had heard some of the explosions of these firings but did not investigate or cause an investigation to be made to determine the cause thereof. The plaintiff came to the boat house after some of the explosive powder had been extracted from the shell and George M. Nungezer, Jr. had already joined the other boys. The explosion of the shell and powder occurred while one of the boys was tapping the shell with a metal object, this boy being Nungezer and the said tapping caused the explosion. Prior to the explosion Marion L. Burn, Jr. and Howard R. Jacobs, Jr. had built one or more home made cannons and had been picking up shells at or near the Quarantine Station, had extracted powder therefrom and at various times had fired their home made cannon on or near the Quarantine Station and t h e sounds of said firing were heard by persons on the Station, including Dr. Joseph Bolten and Pilot Burn and no investigation was made by either to determine the cause of the explosions.

■ From a consideration of the foregoing admissions, it is clear that the defendant the United States had knowledge through its chief officer, Dr. Bolten and another officer, Pilot Burn (the latter being distinctly charged with supervision of the grounds on the day of the explosion) that shells were around the station, that young boys were tampering with same and had actually obtained explosive powder, had used the same for firing their toy cannon, had extracted a shell from the old Confederate cannon and taken the same to the boat house and were working on and with these dangerous articles. And in the face of this knowledge they did nothing to prevent these activities and allowed them to go on thus causing or acquiescing in a train of circumstances which culminated in the fatal explosion whereby the plaintiff was seriously injured. And so it may well be said that the explosion and the resulting damages were caused by the negligence, both active and passive, both in acts of commission and of omission by the officers in charge of and responsible for the safety of the premises that they had in charge and where they allowed and in fact invited the general public, including minors, to visit and have practically free range.

As heretofore shown, I have decided on two separate grounds that the United States is liable to William R. Beasley and I wish to reiterate that I find this liability not only upon both grounds, but upon each of them. And I am of the opinion and hold that even if I should be wrong on one of these two grounds namely: (1) analysis of the testimony and (2) the admissions, either is sufficient ground for my holding. And so it is necessary to appraise the damage and make a finding.

■ Of course, it is almost impossible to translate personal injuries into terms of cash money and whatever we do as a mere approximation. I have given due consideration to the injuries, the suffering and the impairment of the physical activities of young Beasley. He has suffered some impairment, though not very great, in his eyesight, he has suffered very serious impairment by the loss of his leg. Considering all of the medical testimony, some of which I have previously summarized, I believe it reasonable to say that young Beasley is probably impaired in the neighborhood of 50% to what should be the normal, physical and mental condition of a young boy and young man. One of his legs is gone and he can never enter into the full and complete enjoyment of all manly activities in business, sports, recreation or other things going to make up the life of an individual. And as boy and man he must hobble along on crutches or with artificial aids behind his friends, associates and competitors. As to what his earning

capacity will be or would have been is sheer speculation. However, assuming that he is impaired as above suggested, if we were to estimate that he should receive compensation at the rate of approximately $100 per month from the date of the injury through his natural expectancy of life we might arrive at some sum that would seem to meet what might be called the capital loss suffered by him. To arrive at such a figure we make use of the annuity and expectancy tables devised by actuaries, see Code of South Carolina, Sec. 2481 and notes. Using this method as to a boy of 11 years old (he lacked about one month of being 11 when injured) we would arrive at a capital figure of approximately $25,000. We should also consider pain, suffering and possibly general mental and physical injuries not entirely ascertainable at this time.

And so I arrive at a fair estimate of the amount which I think should be awarded and fix that sum at Thirty-five thousand ($35,000) Dollars.

 This opinion so far has dealt entirely with the responsibility of the defendant to the plaintiff William R. Beasley. But we must now consider the second case, that of J. O. Beasley and Martha R. Beasley, the parents of the injured child, against the United States. They, o f course, have a right of action for loss of services, disbursements and expenses incidental to their child being injured, including medical care, hospitalization, physicians' and nurses' fees and other expenses that have resulted; and also for future care and expenses to which they may be put. The summary of the testimony which I have heretofore made applies with equal weight to this case and indicates negligence by the government which, but for the consideration hereinafter stated, would warrant recovery. That portion of the opinion relating to admission of requests however, does not apply since there were no requests filed in this case and so such portion of the discussion must be disregarded as to this case.

 But a much more serious question arises in this matter when we consider whether there was contributory negligence. As heretofore stated, I am convinced that the doctrine of contributory negligence by either the boy or his parents does not apply in the situation of the young child against the government. But the law is very plain and distinct that contributory negligence by a parent, while it will not bar recovery by a minor, will positively bar recovery by the parent himself. See Cirsosky v. Smathers, supra and other cases cited in connection with contributory negligence.

We must therefore consider whether J. O. Beasley, the father and/or the mother, Martha R. Beasley were guilty of contributory negligence. This suit is brought for their benefit as parents. The father testified and stated that he had expended considerable monies and was responsible for the other items set forth in his testimony. He stated that some of these items had been paid for, but that others were not yet fully settled because of lack of available funds but he held himself responsible for them. These consist of payments for nursing, hospital charges and medical bills, including surgeons and specialists. The nursing bills aggregate $75.00, the hospital bills aggregate $1879.19 and the doctors' bills aggregate $1434.00. The grand total is $3388.19. He testified that as yet there had been no charge for the artificial limb, which was furnished by the State but he would be expected to pay for that should he recover here and that he expected to have considerable more expenses for medical supervision and examinations from time to time and probable treatment of eyes and furnishing of glasses and other items that could not well be estimated. It would not be extravagant to estimate the bills for the whole case at approximately $5,000, and I would think that such might be a measure of damages if he were to receive an award.

 But an analysis of the facts raises a very serious question as to whether the father is entitled to receive anything because of his being guilty of contributory negligence. It is distinctly in testimony that he knew of the toy cannon and he told his son to keep away from it. First, it might be suggested that this shows he was exercising care but is it a measure of due care for a person merely to tell his son,

(not yet 11 years old) to keep away from such an attractive toy as a cannon manufactured and operated by older boys with whom he played and associated? Perhaps this might not be sufficient if Mr. Beasley were unconnected with the Quarantine Station. But the facts are otherwise. He is and has been for many years a resident on this Station. He is the second in command as clerical assistant to the officer in charge and he attends to promulgating orders when they are issued and certainly has the right and the duty to see that acts of carelessness and negligence are not committed upon the premises. He had knowledge of the shells lying around the Confederate cannon and he knew that these boys played in and out of the premises and work shops. He knew that a predecessor of Dr. Bolten had written to the children requesting them not to play in the buildings. And with all of that in his knowledge he did nothing to prevent the use of the cannon, allowed his young son to play around with these other boys and took no steps of explanation, supervision or consultation with his superior or other officers. He had been at the station prior to Dr. Bolten's coming, yet he never called to the latter's attention the matter of the loaded shells or the cannon with the shell protruding from its muzzle. His office looked out on the premises where he had an opportunity to see practically everything going on. It seems to me that all of the officers in charge were careless of the safety of the premises and this father was culpable with the others. His negligence certainly directly contributed to the cause of the explosion. If he had used due care and caution none of these things would or could have happened. And so I hold that he is not entitled to recover.

The other plaintiff, Mrs. Martha R. Beasley did not take the stand and there was no testimony as to her knowlege or conduct in regard to these matters, but the father did assume full responsibility for the bills and support of his child. The relationship of husband and wife and of parents and child are so closely and intimately connected that I think it fair to impute to the mother the knowledge and contributory negligence of the father. If she claims any separate loss she should prove it. In the absence of this I hold that there is no greater reason for recovery by her than by him; especially since he took the position that he was responsible for the expenses of the family. And for those reasons I deny recovery by Martha R. Beasley.

And so in Civil Action No. 1901, William R. Beasley v. United States, I find for the plaintiff a verdict in the sum of Thirty-five thousand ($35,000) Dollars together with taxable costs.

And in case No. 1902, J. O. Beasley and Martha R. Beasley v. United States, I find for the defendant.

Appropriate Findings of Fact, Conclusions of Law and Order will be filed.