**Donald K. SCHULTZ, a Minor by His Next Friend, Carl W. Schultz, and Carl W. Schultz**

v.

**UNITED STATES of America.**

**Civ. No. 1083.**

United States District Court
D. Maine, S. D.
June 24, 1959.

William A. Blank, Brooklyn, N. Y., Philip M. Isaacson, Lewiston, Me., Robert C. Zampano, East Haven, Conn., for plaintiffs.

Peter Mills, U. S. Atty., Portland, Me., for defendant.

GIGNOUX, District Judge.

This is an action against the United States of America under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2671–2680, to recover damages for personal injuries sustained by the minor plaintiff as the result of his accidental shooting by Robert S. McAfee on April 29, 1953, at Fort Foster, a United States Government Reservation located approxi-

mately five miles from the Portsmouth Naval Base at Kittery, Maine. Plaintiffs seek $100,000 damages for the personal injuries, pain and suffering, and loss of earnings and earning capacity sustained by the minor plaintiff and for the medical and hospital expenses and loss of services sustained by his father, the adult plaintiff, as the result of the shooting. Defendant counterclaims for the cost of hospital care furnished to the minor plaintiff at the United States Naval Hospital, Portsmouth, N. H., from April 28, 1953 to July 2, 1953, a period of 64 days, which has been stipulated to have had a fair value of $14.25 per day, or a total of $912. At the conclusion of the trial, the parties agreed that judgment should be entered for the defendant on the counterclaim in the amount of $912.

Pursuant to the provisions of Rule 42 (b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., on motion of the defendant, in which the plaintiffs joined, the Court ordered separate trials of the issues of liability and damages. In accordance with this direction, the Court, without a jury, has heard the evidence with respect to the issues of liability, and the following opinion contains the findings and conclusions with respect to such issues as required by Rule 52(a) of the Federal Rules of Civil Procedure.

At all times material hereto, and particularly from mid-1951 through April 29, 1953, the Portsmouth Naval Base, including Fort Foster, was a United States Government Reservation located at Kittery, Maine, owned by and under the supervision and control of the defendant; and Captain (now Admiral) Charles A. Ferriter, Captain Jesse S. McAfee, Security Chief Edward G. Maby and Security Guard Joseph Roginski were United States Government employees in the United States Navy, stationed at the Portsmouth Naval Base.[1] During this period Captain Ferriter was

Administrative Officer of the Portsmouth Naval Shipyard, which was a part of the Base, and in this capacity was directly responsible to the Shipyard Commander for all administrative matters at the Shipyard. Among Captain Ferriter's specific responsibilities were the internal and external security of the Base, including Fort Foster, the supervision of Naval vehicles assigned for such purposes and the custody of small arms ammunition stored at the Shipyard.[2] Captain Ferriter's security duties were delegated by him, through a Security Officer, to Security Chief Maby who exercised direct supervision over approximately 120 security guards, including Security Guard Roginski. Captain McAfee was Supply Officer at the Shipyard, and had no responsibility for security conditions at the Base or at Fort Foster.

During the period 1951–1953 Fort Foster was an abandoned coast artillery post, which had been transferred to United States Navy jurisdiction. Located at Fort Foster were a pistol range for the training of security personnel, incidental storage facilities and abandoned gun emplacements. Although not formally designated as a recreation area, it was also utilized by personnel at the Base, their families and guests for camping, picknicking and swimming. The Fort was completely fenced except along its shore frontage, although the testimony indicates that it was possible to enter the Fort either by crawling under the fence or by walking along the beach at low tide. The two access roads to Fort Foster were closed by gates, which were kept locked at all times, the security guards and other responsible personnel at the Base having keys to these gates. The testimony indicates that signs on the gates, and possibly elsewhere on the fencing, posted Fort Foster as Government property and forbade trespassing by unauthorized persons. During this period the security guards maintained

---

1. Chief Maby and Security Guard Roginski were civilian employees.

2. Captain Ferriter was not responsible for the perimeter security of the Seavey

Island section of the Base or the direct entrances into the Shipyard, which were within the jurisdiction of a Marine Security Detachment.

regular two-hour vehicle patrols to and through Fort Foster.

Both Captain Ferriter and Captain McAfee occupied quarters at the Base with their families. Captain Ferriter's family included two sons, John, who was 16 years old on the date of the accident, and Nicholas, who was 11 years old on the date of the accident. Captain McAfee's family included his son Robert, who was 14 years old on the date of the accident.

It appears that during the period from mid-1951 through April 29, 1953 the security guards, with express authorization from Captain Ferriter, had on numerous occasions transported the Ferriter boys, the McAfee boy, and other dependents of Naval personnel at the Base, to Fort Foster for daily excursions and over-night camping trips. Such transportation was customarily incidental to the regular security patrol to Fort Foster.[3] It also appears that on numerous occasions prior to April 29, 1953 the Ferriter and McAfee boys had taken with them .22 caliber rifles, which were the personal property of Captain Ferriter, and live ammunition, which they used for hunting and shooting while on these trips. No adult supervision was present on these occasions, although the testimony indicates that from time to time the regular security patrol "checked in" on the boys. Although the evidence is in dispute, the Court is further satisfied that this activity was generally known by

personnel at the Base, including Captain Ferriter, Chief Maby, Security Guard Roginski, the captains of the watch and other security guards, who had transported the boys to Fort Foster for these purposes.[4] The guns used on these trips were privately owned, and there is no evidence that Government ammunition was used.

The evidence further establishes that on April 27, 1953 the minor plaintiff, who was then 15 years old and the son of civilian residents of Portsmouth, N. H., was a guest of the McAfee boy at the McAfees' quarters on the Base. During the course of that day and evening the boys met the Ferriter boys and one Peter Shiott, who was also 15 years old and the son of civilian residents of Portsmouth, and together they planned an over-night camping trip to Fort Foster for the evening of April 28. Captain Ferriter and Captain McAfee both testified that they were informed that the boys were planning this over-night camping trip to Fort Foster. There is no evidence, however, that either Captain Ferriter or Captain McAfee knew that the boys were taking guns and ammunition with them on this particular trip.

On the morning of April 28, Mrs. McAfee, with her son and the minor plaintiff, drove into Portsmouth, where the boys picked up the minor plaintiff's equipment and one gun at his home and then stopped for young Shiott, with his

3. Defendant's contention throughout the trial has been that such transportation, being for private purposes in an official Government vehicle, was unauthorized under the applicable statute and regulations governing the use of Government vehicles. See e. g. 5 U.S.C.A. § 78(c)(2); Automotive Vehicle Administration And Operation, NAVDOCKS P–46, Part E (1950); cf. Operation of Government Owned Vehicles Exclusively for Official Use, SECNAV Letter of 2 May 1949. On the other hand, plaintiffs' position has been that since the transportation was incidental to an official patrol, it did not constitute a violation of the applicable law and regulations. Because of the view which the Court takes of the evidence, it is unnecessary to determine whether

or not the transportation of the boys in the Government vehicles was authorized. Infra, footnote 6.

4. The testimony is unequivocal that the security logs customarily maintained by the security guards contained numerous entries during this period noting the presence of the Ferriter boys at Fort Foster, with guns. Chief Maby and Security Guard Roginski both testified to their familiarity with these entries. While Captain Ferriter testified that he customarily read all log entries, he denied specific knowledge of these particular entries. There is no evidence in the record that Captain McAfee was personally familiar with this activity.

equipment and a gun, at his home.[5] Upon their return to the Base, the equipment and guns were stacked in plain view in the McAfees' back yard. Shortly after lunch on that day the security patrol car, driven by Security Guard Roginski, arrived at the McAfee residence with the two Ferriter boys, their equipment and three guns from the Ferriter house. The remaining equipment and guns were loaded into the security vehicle, and the boys were driven by Security Guard Roginski to Fort Foster, where the boys, their equipment and guns were unloaded at the chosen camp site. When the patrol car passed through the main gate from the Base, the Marine guards on duty checked the boys' passes in the customary manner, but did not question them about the guns. There is no evidence that any effort was made to conceal the guns in the security vehicle, and the Court is satisfied that Security Guard Roginski knew of their presence and that undoubtedly they were observed by the Marine guards at the main gate of the Base.

Upon arrival at the camp site, the boys proceeded to set up camp for the night. John Ferriter handed out approximately 100 rounds of ammunition to each boy except young McAfee, who had brought his own ammunition, and the boys spent the afternoon hunting and shooting in pairs throughout the Fort. On one occasion during the evening of April 28 the regular security patrol "checked in" on the boys.

On the morning of April 29 the boys arose early and spent the morning hunting and shooting. At approximately 10:30 A.M. the boys began packing their equipment for their return to the Base and stacked the equipment beside the road to await arrival of the next patrol. While waiting for the patrol, the minor plaintiff, young McAfee and young Shiott were wrestling on the top of a small hill near by. Young McAfee saw young Shiott's gun lying on the ground with 8 unexpended shells in the magazine, which he decided to shoot. At a point about 50 feet distant from the top of the hill where the minor plaintiff and young Shiott were still wrestling, young McAfee threw a cigarette paper into the air, took aim and fired. At that instant the minor plaintiff stood up directly in the line of fire, and the bullet struck him in the back.

■ The pertinent provisions of the Federal Tort Claims Act are as follows: 28 U.S.C.A. § 1346(b) provides that the district courts "shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages * * * for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C.A. § 2674 implements the foregoing jurisdictional statute by providing that the United States shall be liable with respect to such claims "in the same manner and to the same extent as a private individual under like circumstances." Since the accident occurred in the State of Maine, it is conceded that by the express provisions of Section 1346 (b) the substantive law of Maine governs the disposition of this action in all its aspects. See Massachusetts Bonding & Insurance Co. v. United States, 1956, 352 U.S. 128, 129, 77 S.Ct. 186, 1 L.Ed.2d 189; Williams v. United States, 1955, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761; Porto Rico Gas & Coke Co. v. Frank Rullan & Associates, Inc., 1 Cir., 1951, 189 F.2d 397; Parmiter v. United States, D.C.Mass.1948, 75 F.Supp. 823. And Maine law controls even though the incident happened on a Government Reservation. See Stewart v. United States, 7 Cir., 1951, 186 F.2d 627, certiorari de-

---

5. There is no evidence that either the minor plaintiff's or young Shiott's parents knew that their sons were taking guns with them to Fort Foster.

nied, 1951, 341 U.S. 940, 71 S.Ct. 1000, 95 L.Ed. 1367.

In the instant case plaintiffs contend that the minor plaintiff's injuries were caused by the negligent or wrongful act or omission of defendant's employees, acting within the scope of their office or employment, in knowingly permitting the minor plaintiff and his companions, all of whom were minors, to engage in hunting and shooting at Fort Foster without adult supervision, and that defendant is responsible therefor. Upon this record the Court must concur.[6]

██ From the foregoing summary of the evidence, it is clear that the Government personnel in charge of and responsible for security at the Portsmouth Naval Base and Fort Foster, knew, or certainly should have known, that for a period of approximately two years prior to this accident 14 and 15 year old boys frequently had been hunting and shooting at Fort Foster without adult supervision. This record compels the conclusion that certainly Captain Ferriter, Chief Maby, Security Guard Roginski and various other members of the security force were cognizant of this activity. In the opinion of this Court, any responsible official, including those here involved, should have realized that the indiscriminate use of firearms by young boys, without adult supervision, was dangerous and that an accidental shooting might be anticipated. See Bucholz v. City of Sioux Falls, 1958, S.D., 91 N.W. 2d 606, 612. And yet the record is barren of evidence that any of these officials in their official capacities made any effort to supervise or stop this dangerous practice. Having permitted the practice to continue, they must be held responsible for the effects which they should have foreseen. See Stewart v. United States, 7 Cir., 1951, 186 F.2d 627, 632-634; Beasley v. United States, D.C.E.D.S.C.

1948, 81 F.Supp. 518, 524, 525; Hersum v. Kennebec Water District, 1955, 151 Me. 256, 265-267, 117 A.2d 334, 53 A.L.R. 2d 1072; Hutchins v. Emery, 1936, 134 Me. 205, 207-208; Hatch v. Globe Laundry Co., 1934, 132 Me. 379, 382, 171 A. 387. As Government employees charged with responsibility for the security of Fort Foster, they had the duty to act, apart from the status which any of them may have had as parents, a duty which was imposed upon them within the scope of their office or employment. And the failure of these officials to act in their official capacity is chargeable to defendant by the express provisions of the Federal Tort Claims Act. 28 U.S.C.A. § 1346 (b), supra; Beasley v. United States, supra, 81 F.Supp. 524. In view of all of the foregoing, the Court is compelled to the conclusion that the minor plaintiff's injuries were directly attributable to the negligent failure of responsible Government employees in their official capacities to supervise or stop the dangerous practice which has been described, and that defendant is responsible therefor.

██ The Government argues, however, that the minor plaintiff was not on the Government Reservation at the time of the accident for any official purpose; that he was at Fort Foster as a social guest of the McAfees; and that as such his status was that of a trespasser, or at most a bare licensee, to whom defendant owed no duty except to refrain from wanton or willful acts of negligence. See Robitaille v. Maine Central R. Co., 1952, 147 Me. 269, 270, 86 A.2d 386; Foley v. H. F. Farnham Company, 1936, 135 Me. 29, 34, 188 A. 708; Kidder v. Sadler, 1918, 117 Me. 194, 195, 196-197, 103 A. 159; Nelson v. Burnham & Morrill Co., 1915, 114 Me. 213, 216-218, 95 A. 1029. This contention is without merit. The minor plaintiff and young Shiott were on

6. Plaintiffs also argue that responsible Government officials at the Portsmouth Naval Base were negligent in permitting the minor plaintiff and his companions to obtain Government ammunition and in transporting them to Fort Foster in an official Government vehicle. Because of the views hereinafter expressed, it is unnecessary for the Court to consider these further specific allegations of negligence and the strenuously contested question of the Government's liability therefor.

the Base, as others had been on the Base on many previous occasions, as the invited guests of the dependent children of Naval personnel stationed thereon, and they were there with the full knowledge and acquiescence of the responsible officials.[7] Certainly Captain Ferriter and those responsible for security at the Base were familiar with the fact that personnel quartered on the Base had minor dependent children and that these children had minor friends and visitors from neighboring communities. In no sense could they be called trespassers. Such visitors, including the minor plaintiff and young Shiott, were on the Base with the implied and perhaps express consent of the Government. Such being the case, the Government and its officials owed them the duty to exercise reasonable care for their safety. See Beasley v. United States, supra, 81 F.Supp. 526; Searles v. Ross, 1935, 134 Me. 77, 81, 181 A. 820; Brown v. Rhoades, 1927, 126 Me. 186, 188, 137 A. 58, 53 A.L.R. 834; Stewart v. United States, supra, 186 F.2d 633; cf. Peets v. United States, D.C.S.D.Cal. 1958, 165 F.Supp. 177, 180; Claypool v. United States, D.C.S.D.Cal.1951, 98 F. Supp. 702, 706.

■ Finally, it is urged by defendant that even if defendant was negligent, the minor plaintiff is barred from recovery by his own contributory negligence in permitting himself to be placed in a situation of known danger, and that the adult plaintiff is barred from recovery by his contributory negligence in knowingly permitting his son to be present at Fort Foster with guns and ammunition under the circumstances disclosed by this record.

Insofar as the claim of contributory negligence by the minor plaintiff is concerned, the record is wholly devoid of evidence from which it might be concluded that he failed at any time to exercise the degree of care for his own safety which might be expected of a reasonably prudent boy of his age. See Searles v. Ross, 1935, 134 Me. 77, 82, 181 A. 820; Brown v. Rhoades, 1927, 126 Me. 186, 190, 137 A. 58; Easler v. Downie Amusement Co., 1926, 125 Me. 334, 337, 338, 133 A. 905, 53 A.L.R. 847. The record discloses that this was the first occasion upon which the minor plaintiff had been at Fort Foster, and he, therefore, could not conceivably be charged with knowledge of prior unsafe practices on previous camping trips involving the Ferriter and McAfee boys. Although there was evidence of some carelessness in the handling of firearms by the boys on the afternoon of April 28 and on the morning of April 29, prior to the accident, the record does not disclose activity which should have placed a 15 year old boy on notice of the type of negligence in the handling of firearms which resulted in his injuries.

Insofar as the charge of contributory negligence by the adult plaintiff is concerned, there is no evidence that he knew, or should have known, that his son was at Fort Foster on this occasion, or on any prior occasion, with guns and ammunition.

In accordance with the foregoing opinion, judgment will be ordered for plaintiffs, with costs, in amounts to be determined by the Court following a hearing upon the issues of damages. In accordance with the agreement of the parties, judgment will be entered for defendant upon the counterclaim in the amount of $912, without costs.

7. The evidence establishes that during the period involved the Fort Foster facilities were utilized frequently for similar excursions by minor dependents of Naval personnel in addition to the McAfee and Ferriter boys. All of them went there with the acquiescence of authorized Naval personnel. Of this particular excursion, Admiral Ferriter specifically testified that he knew of and acquiesced in the presence of both the minor plaintiff and the Shiott boy. Further, the boys were issued official passes, transported to the Fort by an official Navy vehicle, and were left, with their equipment, at their camping site at the Fort. Finally, on the evening of April 28 at least one patrol looked in on the boys at the camp site, and the regular patrols to and from the Fort passed near the area in which the boys were camped at regular intervals during the camp-out.