[L. A. No. 23502.   In Bank.   Apr. 19, 1955.]

THOMAS WARNER, JR., Appellant, v. SANTA CATA-
LINA ISLAND COMPANY et al., Defendants; OLIN
INDUSTRIES, INC. (a Corporation), Respondent.

Manuel Ruiz, Jr., for Appellant.

Crider, Tilson & Ruppé for Respondent.

CARTER, J.—Plaintiff, Thomas Warner, Jr., appeals from a judgment of nonsuit in an action for damages for personal injuries. Plaintiff originally brought suit against Olin Industries, Inc., a corporation (aka Western Cartridge Company), and G. W. Rushmore, Amory P. Eckley, Thomas Browne,

Gene Nordlund and Edward Nagle. Prior to trial, defendants Rushmore and Eckley paid plaintiff the sum of $22,000 in consideration of which plaintiff executed a covenant not to sue defendants Rushmore, Eckley and Browne. Rushmore and Eckley filed a cross-complaint against Olin Industries, Inc., for the amount expended for the covenant not to sue. Olin Industries answered, and at the beginning of the trial, moved for judgment on the pleadings as to Rushmore and Eckley. The motion was granted, no appeal was filed and that matter is now final. The cause went to trial only against defendant Olin Industries, and it is now respondent on this appeal.

Plaintiff, on July 18, 1947, was at a shooting gallery watching one of his party shoot at a target when a particle of a bullet ricocheted and entered his eye, causing him to lose the sight therein. The shooting gallery was owned and operated by Rushmore and Eckley; Nordlund, as their employee, was the actual operator of the concession. Cartridges containing bullets known as "Kant-Splash," used in the guns from which customers fired at various targets in the gallery, were manufactured by defendant Olin Industries.

Plaintiff alleged that Olin represented to the purchasers and users of its "Kant-Splash" bullets that they were designed for use in short range shooting galleries and to disintegrate upon striking a metal target or backstop; that Olin was negligent in the manufacture, testing and inspection of the bullets, as a result of which he was injured.

The record shows that there was a metal backstop the width of the gallery at the back thereof, which extended from the floor to the ceiling; that from the ceiling were suspended four metal baffles between the counter and the backstop; the sides of the gallery from the backstop to the counter were metal lined; the counter was approximately 37 feet from the backstop. Targets consisted of metal owls, metal rabbits on a revolving wheel, paper bulls'-eyes; metal cylinders and other metal bell-type objects. The backstop was pitted, rather than smooth. Small particles of metal were found imbedded in wooden portions of the shooting bench, or counter, and some were found near the counter; the metal sides of the gallery were marked or scraped; the baffles were dented. Plaintiff was approximately 40 feet from the backstop at the time he received his injury.

The particle which entered plaintiff's eye has never been removed because to do so was considered extremely hazardous.

Defendant contends, but not seriously, that it might have been a portion of one of the metal targets which entered plaintiff's eye. So far as this appeal from a judgment of nonsuit is concerned, the contention appears without merit. The operator of the concession testified that by the sound he could tell whether the marksman had hit a target and there is, apparently, no evidence that the person shooting, at the time plaintiff was injured, hit any one of the objects in the gallery. Plaintiff alleged that a portion of the Kant-Splash bullet caused his injury and there is no evidence to the contrary.

Plaintiff's evidence showed that defendant had been manufacturing Kant-Splash cartridges for use in shooting galleries since 1944; that underneath the name Kant-Splash on the package of cartridges appeared the following words: "These cartridges have special synthetic greased bullets designed to disintegrate upon striking a metal target or backstop"; that the bullets were advertised to the trade as those which would disintegrate into small particles with "splash-backs" reduced to an absolute minimum.

Mr. Doughan, the manager in charge of sales and distribution of the ammunition manufactured by defendant, testified (by deposition) that he was aware of the fact that when customers ordered shooting·gallery cartridges, "particularly Kant-Splash" they were ordered so that they would disintegrate into powder or dust. He qualified the statement with the provision that the "backstop [must be] in good condition"; that by "good condition" was meant a "smooth finish" ordinary sheet steel background. He testified that he was aware that the ordinary shooting gallery had various targets; that these targets were between the customer and the backstop. His testimony showed that he knew of no material in writing wherein "any reference [was] made to the fact that the backstop ought to be smooth when Spatterpruf and Kant-Splash bullets [were] used in galleries"; that he knew of no warning issued by the defendant that the Kant-Splash bullets might splash back and injure a customer, or bystander.

Mr. Bellmore, the superintendent of the inspection division for defendant, testified (by deposition) that he was responsible for the quality of the products that were being manufactured during the time of manufacture; that during the years 1946-1947 he was assistant ballistic engineer and that his duties then were to perform tests on ammunition during the course of manufacture; that he had been "associated"

with the tests on Kant-Splash bullets since that time; that the tests were indirectly under his supervision; that he usually observed the results of the tests. Mr. Bellmore testified that the material used in Kant-Splash bullets was designed to disintegrate into small particles upon hitting a hard object such as iron, steel or stone; that although he had conducted tests for the disintegration qualities of the bullets he had never segregated the particles of a disintegrated bullet to ascertain the size of the particles; that no one in the organization had done so as far as he knew; that he did not know how small the particles were; that he was not acquainted with the standard measurements used to compute the size of such particles; that defendant had no such instruments or measures; that whether Kant-Splash bullets disintegrated upon being shot at a steel, or similar hard wall, depended upon the condition of the steel backstop against which it was fired; that by "good condition" he meant a backstop which was not pitted, and by "not pitted" he meant no pits visible to the naked eye; that if there was any visible pitting, the particles might spatter; that he had never made any examination of actual shooting gallery backstops. Mr. Bellmore testified that even with a *"smooth, unpitted steel background, small particles will come back approximately 30 feet"*; that no tests had been made of the velocity of those particles. He testified that no tests had been made on lead targets, or on warped plates, although warping would affect the amount of spatter or splash in that there would be more ricocheting and less spattering; that tests had been conducted at a distance of 40 feet from the backstop and that particles had been found to extend approximately 40 feet from the backstop *even though the backstop was a smooth, unpitted one.*

Mr. Frost, the manager of the Products Service Division for the defendant, testified (by deposition) that the only way of testing a bullet was after its manufacture; that out of 10,000 bullets "probably 24" would be tested; that 200,000 Kant-Splash bullets were made per day; that testing took place once a week; that the bullets tested were not "lotted" but were selected at random from the production; that the spatter-back tests were on approximately 100 bullets per week; that they were not able to ascertain from what machine any particular bullet came; that even if a bullet showed a great amount of spatter-back, there was no way of telling what machine it came from; that no spatter-back tests had been made on a pitted plate; that the plates used in the spatter-

back tests eventually became pitted; that every time a spatter-back test was made, the plate was examined for pits and when pits were found, the plate was replaced.

Mr. Franz, assistant works manager for defendant, testified (by deposition) that his duties consisted of the "Inspection Division, Explosives, and Technical Control Division and the Cartridge Division." He testified as to the results of spatter-back tests made in 1947. The tests were made each time of 100 26 grain bullets. The result of one entire test made in that year, showed 75.8 grains at a distance from 10 to 20 feet; 14.5 grains at a distance of 20 to 30 feet, and 9.5 grains "mostly unburned" at a distance of 30 to 40 feet. A test made a month later showed 77.8 grains at 10 to 20 feet; 21.0 grains at from 20 to 30 feet; one 6 grain piece at 20 feet and 5 grains at from 30 to 40 feet. The evidence shows that all the tests were made by the tester shooting always at a 90-degree angle at a distance of 40 feet; that shooting galleries average from 25 feet in length to 40 feet. A summary of the results of the available tests made in 1947 for the approximate distance from the backstop at which plaintiff was injured, shows (February 3) a spatter-back of 9.5 grains "mostly unburned" at a distance of 30 to 40 feet; another test (March 3d) shows 21.0 grains at from 20 to 30 feet with one particle found at 20 feet weighing 6 grains, and 5 grains at from 30 to 40 feet; another test (April 7th) shows 88.4 grains at from 10 to 20 feet, 14.1 grains at from 20 to 30 feet, 6.5 grains at from 30 to 40 feet; another test (May 5th) shows 7.2 grains at from 30 to 40 feet; another test (May 19th) shows 6.5 grains "mostly unburned" at from 30 to 40 feet; another test (May 26th) shows 6.5 grains "mostly unburned" at from 30 to 40 feet; another test (June 3d) shows 7.3 grains "mostly unburned" at from 30 to 40 feet; another test (June 16th) shows 5.3 grains at from 30 to 40 feet; another test (June 24th) shows 3.7 grains "unburned powder" at from 30 to 40 feet. It was the witness' best judgment that from 60 to 70 per cent of the shells manufactured in 1947 had been manufactured during the first six months of the year.

Mr. Bellmore testified that Kant-Splash bullets were manufactured of approximately 90 per cent lead, approximately 9 per cent zinc, and approximately 1 per cent oil; that these substances were compressed by squeezing them in a hydraulic press, but that he did not know the poundage used; that the bullet was lubricated with a lubricant whose composition he

did not know. He testified that some tests had been made by shooting through a piece of paper at 50 feet and that particles did not come back from the backstop through the paper.

The trial court granted defendant's motion for a nonsuit because it was of the opinion that defendant was not guilty of any negligence in either the manufacture or inspection of its Kant-Splash cartridges; that no duty existed on defendant's part to warn the gallery operators of any inherent dangers in the cartridges; that even if such a duty existed, the defendant could not be expected to "reasonably anticipate the action of the gallery operators in continuing to operate that gallery as they did with full knowledge that these bullets did splash back or ricochet, and that they were inherently dangerous in the manner they were used in that particular gallery." It was concluded that the failure of defendant to give notice to the gallery operators "if there was any inherent danger in them" was not a proximate cause of the plaintiff's injuries.

▪ ■ "A motion for nonsuit may properly be granted '. . . when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.' (*Card* v. *Boms,* 210 Cal. 200, 202 [291 P. 190] ; see also *Blumberg* v. *M. & T. Inc.,* 34 Cal.2d 226, 229 [209 P.2d 1] ; *Golceff* v. *Sugarman,* 36 Cal.2d 152, 153 [222 P.2d 665].) ■ 'Unless it can be said as a matter of law, that . . . no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury.' (*Estate of Lances,* 216 Cal. 397, 400 [14 P.2d 768] ; see also *Raber* v. *Tumin,* 36 Cal.2d 654, 656 [226 P.2d 574].)" (*Palmquist* v. *Mercer,* 43 Cal.2d 92, 95 [272 P.2d 26].)

A summary of plaintiff's evidence shows that defendant's Kant-Splash bullets were designed for, and sold for use in short range shooting galleries; that all testing of the bullets was done under ideal conditions in that a smooth, unpitted backstop was used; that at no time were any tests made under actual shooting gallery conditions with targets between the person doing the shooting and the backstop; that the test

shooting was always done at a 90-degree angle; that no measurement was made of the size of the particles which spattered back or ricocheted from the metal backstop; that there was no way of ascertaining from which machine a bullet came; that even when tests were made under the above stated ideal conditions, each test showed a spatter-back which extended 30 to 40 feet from the backstop. Plaintiff's evidence showed that defendant sold its cartridges on the theory that when the bullets hit a metal surface, the bullets would disintegrate into powder or dust.

All persons are required to use ordinary care to prevent others being injured as the result of their acts; ordinary care has been defined as that degree of care which people of ordinarily prudent behavior could be reasonably expected to exercise under the circumstances of a given case. In other words, the care required must be in proportion to the danger to be avoided and the consequences that might reasonably be anticipated (*Crowe* v. *McBride,* 25 Cal.2d 318, 321 [153 P.2d 727]; *Hatzakorzian* v. *Rucker-Fuller Desk Co.,* 197 Cal. 82, 98 [239 P. 709, 41 A.L.R. 1027]; 19 Cal.Jur. 579).

The risk incident to dealing with fire, firearms, explosive or highly inflammable matters, corrosive or otherwise dangerous or noxious fluids requires a great deal of care to be exercised. In other words, the standard of care required of the reasonable person when dealing with such dangerous articles is so great that a slight deviation therefrom will constitute negligence (*Rudd* v. *Byrnes,* 156 Cal. 636 [105 P. 957, 20 Ann.Cas. 124, 26 L.R.A.N.S. 134]; *Cucinella* v. *Weston Biscuit Co.,* 42 Cal.2d 71, 75 [265 P.2d 513]; *Lasater* v. *Oakland Scavenger Co.,* 71 Cal.App.2d 217, 221 [162 P.2d 486]).

There can be no doubt but that ammunition used in guns has propensities dangerous to human life. Plaintiff's evidence also established that defendant knew its ammunition was to be used in shooting galleries, that those galleries were usually found in crowded places; that the shooting was done in close proximity to other persons; that defendant's cartridges spattered back even though the testing was done under ideal conditions unlike those prevalent in most shooting galleries; that defendant's tests showed that its cartridges did not disintegrate into powder or dust, but into particles which ricocheted as far as 40 feet, the longest length of any shooting gallery. From this evidence and other evidence found in the record, the jury could have legitimately inferred

that defendant was guilty of negligence in manufacturing and inspecting a product dangerous to human life in that it had deviated from the great degree of care required of one manufacturing an explosive article. ■ Defendant's conduct must always be gauged in relation to all the other material circumstances surrounding it, and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care then such doubt must be resolved as a matter of fact rather than of law. (*Mosley* v. *Arden Farms Co.*, 26 Cal.2d 213, 217 [157 P.2d 372, 158 A.L.R. 872] ; *Toschi* v. *Christian*, 24 Cal.2d 354, 360 [149 P.2d 848] ; *Estate of Lances*, 216 Cal. 397, 400 [14 P.2d 768] ; *Raber* v. *Tumin*, 36 Cal.2d 654, 656 [226 P.2d 574] ; *Palmquist* v. *Mercer, supra*, 43 Cal.2d 92, 95.)

Defendant argues that the negligence of the operators of the shooting gallery in permitting the use of a pitted backstop and their knowledge, or the knowledge that they should reasonably have had, that the cartridges did not disintegrate into powder or dust but did spatter and ricochet is such superseding, intervening negligence as to relieve it of liability. In other words, defendant contends that its negligence, if any, was not the proximate cause of plaintiff's injury. To show knowledge of the ricocheting qualities of defendant's product, defendant points to the testimony of John Smith who operated a game concession 15 feet back of the counter from which the shooting gallery customers shot at targets. Approximately two or three weeks prior to plaintiff's accident, while Smith was sitting at his concession, he felt a sharp pain in his back (which was turned toward the gallery) and found that a sliver of some sort of metal was stuck therein. He testified that he told the operator of the gallery about it, but could not remember which one of the three persons interested therein he had told. He also testified that he had heard ''pinging'' noises prior thereto which sounded like someone ''engaged in horseplay'' at the pinball machines which were interposed between his concession and the shooting gallery. Defendant also places emphasis on the fact that plaintiff's evidence showed particles of metal imbedded in the counter and other portions of the gallery as well as the pitted condition of the metal backstop. Plaintiff's witness, Browne, who supervised the shooting gallery testified that he had not noticed the particles or the pitted condition prior to the time plaintiff's expert made his examination after the

accident occurred. There was no evidence concerning the times at which the particles had become imbedded in the wooden portions of the gallery although the expert witness testified that it had occurred over a period of time.

Assuming that the evidence was sufficient to show that the operators of the gallery knew of the pitted condition of the backstop and the imbedded particles of metal in the wooden portions thereof, and continued to operate the gallery knowing of the dangerous propensities of defendant's cartridges, it must be determined whether such negligent conduct on the part of the operators should have been reasonably anticipated by the defendant. ■ Section 447 of the Restatement of Torts, sets forth the rule as follows: "The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if (a) the actor at the time of his negligent conduct should have realized that a third person might so act. . . ." It has been held that this rule is applicable in California (*Stasulat* v. *Pacific Gas & Elec. Co.*, 8 Cal.2d 631 [67 P.2d 678]; *Mosley* v. *Arden Farms Co.*, 26 Cal.2d 213, 219 [157 P.2d 372, 158 A.L.R. 872]; *Sawyer* v. *Southern Calif. Gas Co.*, 206 Cal. 366 [274 P. 544]). The issue of proximate cause is essentially one of fact (*Fennessey* v. *Pacific Gas & Elec. Co.*, 20 Cal.2d 141 [124 P.2d 51]; *Mosley* v. *Arden Farms Co.*, *supra*, 26 Cal.2d 213, 219; *Crowe* v. *McBride*, *supra*, 25 Cal.2d 318, 321). ■ From the evidence, the trier of fact could have inferred that defendant knew of the dangerous propensities of its cartridges; that it knew that its product did not disintegrate into powder or dust upon striking even a smooth metal surface; that it knew the dangerous character of the cartridges became intensified when a pitted surface was present in the metal backstop; that defendant knew, or could in the exercise of reasonable care have known, that shooting gallery conditions were different from the ideal conditions under which its tests were conducted. The trier of fact could reasonably have concluded that defendant, at the time it made its tests of Kant-Splash cartridges realized, or should have realized, that operators of shooting galleries might not take the utmost precautions in the use of the cartridges. In other words, the negligence of the operators of the shooting gallery could have been found by the trier of fact to have been reasonably foreseeable by the defendant and hence not

a supervening, independent cause of plaintiff's injury. (*Gall* v. *Union Ice Co.*, 108 Cal.App.2d 303, 313 [239 P.2d 48]; *Northwestern Nat. Ins. Co.* v. *Rogers etc. Foundry*, 73 Cal. App.2d 442 [166 P.2d 401].) The danger of spattering, or ricocheting particles was precisely the danger defendant sought to minimize with its specially designed Kant-Splash bullets and any conduct tending to increase that danger should have been, in the exercise of reasonable care, foreseeable by defendant and the jury could have concluded that its tests should have been conducted with the end to be achieved in view.

Defendant contends that plaintiff has not shown how it was negligent in the manufacture or testing of its product or in what better and safer way the manufacture or testing could have been accomplished. It is argued that it was incumbent upon plaintiff to introduce expert testimony as to the proper tests, inspections, and processes of manufacturing and that the tests and methods of manufacture used by defendant did not meet "this standard." This is an appeal from a judgment of nonsuit and we must accept plaintiff's evidence and every legitimate inference to be drawn therefrom in an endeavor to determine whether it is so lacking in evidentiary support that we would be bound to set aside a verdict for the plaintiff had one been reached by the trier of fact. (*Palmquist* v. *Mercer, supra*, 43 Cal.2d 92, 95.) In so doing it appears as heretofore set forth that plaintiff has made out a case for defendant's negligence as the proximate cause of his injury and that defendant's argument would be a matter of defense on the trial of the issues of negligence and proximate cause.

The judgment is reversed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.