Alvy PARROTT, a minor, by Joe Parrott, his guardian ad litem; Joe Parrott; Walter Dwight Anthony, a minor, by Jimmie Faye Anthony, his guardian ad litem; Carlos Pat Anthony, a minor, by Jimmie Faye Anthony, his guardian ad litem; and Jimmie Faye Anthony, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 902–57.

United States District Court
S. D. California,
Central Division.

Feb. 26, 1960.

King & Mussell, by Arthur Olson, San Bernardino, Cal., for plaintiffs.

Laughlin E. Waters, U. S. Atty. for Southern District of California, by Richard A. Lavine, Asst. U. S. Atty., Chief, Civil Division, and Clarke A. Knicely, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

TOLIN, District Judge.

This action to recover damages under the Tort Claims Act [1] produced evidence of near-gross negligence on the part of Government personnel. Unless the application of some special defensive rule arises to defeat recovery, the plaintiffs should prevail. It is urged by the Government that two such rules completely negative the plaintiffs' case. The first of these is that " * * * [A] vendor of land is not subject to liability for bodily harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession." [2] The second special rule claimed by the Government to defeat recovery is that the plaintiffs were trespassers and that, despite their considerable youth at the time of the event (8, 9 and 10 years of age), the attractive nuisance doctrine does not apply under the facts of this case.

The evidence has established that during World War II the United States Army, as a lessee, occupied certain land in Riverside County, using it as a small arms practice range. The property was released to its private owners in 1947 and the Government has been out of possession since that time. The accident occurred February 12, 1957. Neither the owner nor his successors have been sued. Except during its use by the military, the larger part of the leasehold, consisting of an unfenced peneplain,[3] has been used principally for potato farming. The physical characteristics of the land are in evidence largely through a view had during the trial. Rising rather abruptly from the peneplain is a hill-like formation—largely a residue of boulders from which much of the soil has been eroded by rains.[4] This part of the terrain itself is somewhat unusual and apt to invite entry by a young boy.

The only practical purpose for the hill which has been suggested by the evidence is the military one to which it was at one time put by the Government. The almost plain-like land which surrounds it is, however, splendidly adapted to raising field crops, and the area abounds with potato fields, one of which extends to the very base of the monadnock. Most of the fields in the area, including the one formerly a Government leasehold, are unfenced.[5] During the Army's use of the land, military personnel were trained upon it in the use of rifle grenades by actually firing them at targets within the area. The only evidence that the property was cleared of unexploded grenades before being returned to civilian occupancy is a certificate [6] to the effect that the area has been de-dudded. Ten years elapsed without

1. 28 U.S.C. § 1346(b).

2. Restatement, Torts § 352 (1934).

3. In his "Introduction To Physical Geology", Professor William J. Miller of the University of California defines a peneplain: "Any region which has been worn down by erosive agencies to a condition of very low relief at, or very nearly at, base level is called a peneplain * * * meaning an almost-plain."

4. This is probably a monadnock, "a mass of rock or a hill which, as an erosion remnant, rises above the general peneplain level". Encyclopaedia Britannica (1952). The "Introduction To Physical Geology", cited note 3 supra, relates that monadnocks are not very common.

5. Occasional "No Trespassing" signs do not mean much to the bucolic populace of this area who are given to moving about with considerable freedom.

6. Exhibits Q and R.

untoward results following the time when the Government's military personnel made what the court now finds was an exceedingly negligent and cursory search of the portion of the land here involved prior to issuing their certificate. The certificate relates to the entire property. The actual search probably was only conducted on the peneplain. The court's finding of an exceedingly negligent search relates to that made upon the monadnock.

It is apparent from the entire context of the evidence and particularly emphasized by the physical characteristics of the property and a history lacking in explosions of live grenades during the intervening ten years, that the de-dudding party did well in removing unexploded grenades from the almost plainlike area which surrounds what appears to be a monadnock. It is equally apparent, however, that the attention given by the de-dudding party to the land readily adaptable to potato farming was not given to the monadnock, which has little potential for utility.

■ On the afternoon of February 12, 1957, the three minor plaintiffs were confronted with the recognition by their school of Lincoln's birthday. They had a free afternoon in one of the most fruitful Indian relic areas of California. The property in question is in Riverside County where two years previously an official study [7] disclosed that there were still many Indians and eleven active Indian reservations. Of the counties of California, only neighboring San Diego had more Indian reservations at that time. Plaintiffs' presence not being required in school that afternoon, the boys went forth with the avowed purpose of seeking Indian relics. A primitive area like the monadnock in the potato field was a likely place to find such things as arrowheads. What they found, however, was a small rifle grenade not far up the incline and rather conspicuously at rest between rocks. (During the view which was had, the plaintiff who found the grenade indicated the exact spot at which he had located it.) The boys took the grenade home, and, after some futile attempts to take it apart, plaintiff Alvy Parrott threw it upon the pavement. It immediately exploded, inflicting various injuries, all serious, upon the three boys. Plaintiffs base their case upon the assertion that Army personnel failed to properly police or de-dud the firing range prior to its return to civilian use. The court finds that this is true. "The risk incident to dealing with * * * explosive * * * matters * * * requires a great deal of care to be exercised. In other words, the standard of care required of the reasonable person when dealing with such dangerous articles is so great that a slight deviation therefrom will constitute negligence." [8]

7. Report of "Senate Interim Committee on California Indian Affairs." The Committee was created by California Senate Resolution 115 as recorded in the California Senate Journal, June 10, 1953. Indians, as free aborigines, have suffered problems as the individual members of tribes have tended to be absorbed into the community at large. The problems incident to this situation are the subject of United States House Concurrent Resolution 108, 83rd Congress, First Session, August 1, 1953, it being the sense of the Resolution to make Indians subject to the same laws as non-Indians and to free them from the historical disabilities of the Indian as rapidly as the program could be accomplished. In recognition of this Federal policy the California Senate had its study made. Little of this, of course, had come to the attention of the plaintiffs who were aware they lived in Indian country, and is referred to here simply to show that the plaintiffs were in the area where the natural stimuli germinated by the terms "Indian" and "Indian relics" would be apt to lead them to the geographical area and formation involved. The court would not expect these 8, 9 and 10 year old boys to know the details of the history, but an Army, having used the area for extensive dropping of small explosive objects, should appreciate the situation and the foreseeability factor is enhanced.

8. Warner v. Santa Catalina Island Co., 1955, 44 Cal.2d 310, 317, 282 P.2d 12, 17. There is nothing to the contrary in Dalehite v. United States, 1953, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, where the Court condemned the theory of "absolute liability" under the Tort Claims Act.

The same afternoon that the boys were injured, Air Force personnel came a distance of some miles to the area in which the boys found the grenade, and the same day located at least three more which had every appearance of containing a. similar explosive. An exhibit in the case [9] is a picture of the finder holding five grenades which were found during that afternoon. It was uncertain in the testimony whether all five were still in condition to be exploded. Three were live grenades and two were in uncertain status, probably impotent. However, the rule of Warner v. Santa Catalina Island Co.,[10] supra, would require removal of the two although probably impotent when they were found on this site. Similarly, even were the remaining three found to be actually harmless, they had the outward appearance of being live grenades, and in the opinion of experts were live. Any prudent searcher of the area coming upon them would have removed them. The court must conclude that the searchers just did not climb to the elevated area.

■ The rule above quoted, and upon which defendant relies, has been taken by the court from the Restatement although it is so well recognized that a search of the case law of any one of the States could be expected to develop a long list of cases in which it has been applied. Within its language it is not strictly applicable to this case because it has reference to the liability of the vendor of the land (here the defendant was a lessee of the property at the time the dangerous object was placed there and at the time the de-dudding operation was negligently carried out.) This, however, cannot be of substantial concern. It is a criticism of the wording of the rule rather than the statement of a valid limitation of the rule itself. It appears that the general rule of non-liability is intended to cover those situations where the party sought to be held responsible was at one time responsible for the condition but at the time of injury was no longer connected with the land.[11] The omission of this precise situation by the drafters of the rule is probably explained by the fact that it is a rare plaintiff who will sue the lessee when he also has a cause of action against the lessor. The objection to applying the rule here is much more fundamental. The rationale of non-liability has generally been applied to cases in which there was either a defect in the realty or in some fixture on the premises—conditions for which the owner of the property is responsible. For instance, Stone v. Heyman Bros.[12] was a case in which plaintiff fell through a skylight in a building which she had purchased from defendant. The skylight did not comply with a local ordinance requiring either re-enforcement of skylights or a protective barrier around them. Recovery was denied on the ground that it is the owner of a building who is responsible for defects in its condition and when one purchases property thus defective it is the purchaser's obligation to correct the situation. The Stone case, which established the rule in California, relied exclusively upon cases involving defective conditions of either the land itself or of fixtures.[13] This indicates that the California court did not have a situation like the present one in mind when it adopted the rule of non-liability.[14]

California also applied section 352 of the Restatement in Copfer v. Golden.[15] That case concerned four defendants,

9. Exhibit 2.

10. 1955, 44 Cal.2d 310, 282 P.2d 12.

11. See Restatement, Torts § 354 (1934).

12. 1932, 124 Cal.App. 46, 12 P.2d 126.

13. Upp v. Darner, 1911, 150 Iowa 403, 130 N.W. 409, 32 L.R.A.,N.S., 743 (illegal barbed wire fence); Slavitz v. Morris Park Estates, 1917, 98 Misc. 314, 162 N.Y.S. 888 (unguarded open pit on land); Palmore v. Morris, Tasker & Co., 1897, 182 Pa. 82, 37 A. 995 (gate into factory); Smith v. Tucker, 1925, 151 Tenn. 347, 270 S.W. 66, 41 A.L.R. 830 (falling mantel piece in house).

14. This circumstance is mentioned because the Tort Claims Act requires California law to be applied here.

15. 1955, 135 Cal.App.2d 623, 288 P.2d 90.

three of whom had deeded their joint interests in the real property to the fourth several months prior to the injury. The fourth defendant had been conducting a junk business on the land, and a child was injured in a fall from a trailer which was held to constitute an attractive nuisance. A judgment for the plaintiff was reversed as to the three vendors, it appearing that they had no interest in the junk business and had never used or owned any of the items on the land. So, although the harm was caused by a chattel, that chattel had neither been brought nor left upon the land by the defendants in favor of whom the rule of non-liability was exercised. They were guilty of no negligence. Any responsibility on their part could only have been predicated upon their ownership of the premises and the duty of care which an owner owes.

In the case here decided there was nothing wrong with the land or with any fixtures thereon. Highly dangerous small chattels were negligently left upon the land. In this type of case courts have no reason to discuss the rule. For instance, in Kelley v. Black,[16] where a vendor of property threw a partially filled can of anti-freeze into some high weeds before terminating his estate, he was held liable when two children of the vendee were killed when the can exploded while weeds were being burned. Also, in Eckart v. Kiel,[17] where the grantor left dynamite caps upon land and these injured the child of the purchaser, recovery was allowed upon general principles of liability. In neither case was the rule here urged by the defendant discussed by the court. The courts, in the cases just briefly summarized, recognized that the basic situation was one of negligence concerning chattels. The negligence was inherent in a situation rather than incidental to an ownership. Hence, there was no reason to bring into play a rule which, although indexed under "Negligence", is actually a hybrid of property and negligence law.[18] In cases like Kelley v. Black, concerning anti-freeze thrown into weeds, or Eckart v. Kiel, the dynamite caps case, the courts recognized that they were dealing with negligence or lack of care respecting chattels. The Reporter for the Restatement of Torts, Professor Bohlen, in one of his respected texts,[19] points out that liability arising out of a dangerous condition of the premises themselves should pass with title to the premises, but comments that a tort feasor should not be relieved from liability for a negligent act solely because the act was committed upon land which he has since conveyed.

"The liability depends upon an act wrongful by whomsoever done and does not depend on ownership or possession, and there seems, therefore, no reason why, simply because the wrongdoer happens *to be the* owner, his liability should be terminated by the alienation of the scene of the wrong."

■ It does not appear, then, that this court must apply section 352 to this case, even though that rule has been adopted by the California courts. As indicated, the California cases and the out-of-state decisions upon which they rely have held the transferor of the premises free from liability only in instances where injuries have resulted from defects in the condition of the land or of buildings. In those cases, the duty of care is dependent upon ownership or possession, and it is reasonable to terminate the duty upon transfer. Neither of the California decisions has concerned a negligent act of the defendant, wrongful independent of ownership, for which redress is sought subsequent to transfer of

16. 1948, 203 Ga. 589, 47 S.E.2d 802.

17. 1913, 123 Minn. 114, 143 N.W. 122.

18. "This makes it unnecessary to consider cases involving a dangerous chattel left upon the property by the vendor, since such cases are based upon the general duty of care owed by all persons to safeguard others, rather than upon any special duty owed by a vendor to a purchaser or third persons upon the property." Annotation, 1949, 8 A.L.R.2d 218.

19. Bohlen, Studies in the Law of Torts 82–84 (1926).

the property upon which the act was committed. In such a case, the defendant must act in accord with that general duty of reasonable care to which all persons must comply.

Before such a duty may be placed upon this particular defendant, however, another facet of the case must be examined. Plaintiffs were either trespassers or licensees. They had no express permission to enter the land. Generally, the possessor of land [20] owes no duty of affirmative care to a trespasser, and need only abstain from wilfully or wantonly injuring him.[21] However, as previously noted, the particular area was one well known as a repository of Indian relics. It had, in addition, a certain attraction to youngsters because of the normal residue of junk which is to be found on an abandoned military range. It was rural, unfenced, and of easy access. Whether trespasser or licensee, the court need not determine exactly, for what has been commonly referred to as the attractive nuisance doctrine as applied in California would, in any event, require a showing of ordinary care by this defendant.

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or artificial condition which he maintains upon the land, if

"(a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and

"(b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving the an unreasonable risk of death or serious bodily harm to such children, and

"(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and

"(d) the utility of the possessor of maintaining the condition is slight as compared to the risk of young children involved therein." [22]

The duty of care in this case had its origin when what had been a restricted military target range was being readied for return to the unregimented community. As has been indicated, the community was one in which there was an extensive history of aboriginal Indian life. Modern Indians still enjoyed the protection of eleven reservations within the single county where the property was located. At least one novel has been written concerning Indian life indigenous to the region.[23] This novel has been

20. It should here be noted that the Federal Government was not in possession of the land when the plaintiffs committed their trespass. It has apparently never been determined whether such a defendant may avail himself of the immunity granted a possessor against trespassers. The courts are widely divided on the question of who may benefit from the landholder's favored position, with the majority tending to strictly limit the inoculated class. See 2 Harper and James, Law of Torts 1433 (1956); Prosser, Torts 434 (2d ed. 1955). California has granted the immunity to a business invitee of the possessor, Kirkpatrick v. Damianakes, 1936, 15 Cal.App.2d 446, 59 P.' 2d 556, but has denied it to a 'power company holding a right of way in the land, Langazo v. San Joaquin L. & P. Corp., 1939, 32 Cal.App.2d 678, 90 P.2d 825.' However, since the act upon which plaintiff would predicate liability was performed while this defendant *was* in possession, it would seem proper to allow defendant the possessor's immunity.

21. Giannini v. Campodonico, 1917, 176 Cal. 548, 169 P. 80.

22. Restatement, Torts § 339 (1934); Melendez v. City of Los Angeles, 1937, 8 Cal.2d 741, 68 P.2d 971; Woods v. City and County of San Francisco, 1957, 148 Cal.App.2d 958, 962–963, 307 P.2d 698; Lopez v. Capitol Co., 1957, 141 Cal.App. 2d 60, 66, 296 P.2d 63, 67; Copfer v. Golden, supra, 135 Cal.App.2d at page 628, 288 P.2d at page 93.
Since the defendant here has been given the benefit of the possessor's limited duty toward trespassers, see note 20 supra, it will also be considered "a possessor of land" for the purpose of attractive nuisance.

23. '"Ramona", by Helen Hunt Jackson.

dramatized and each year residents from the plaintiffs' community and immediately adjacent communities present a large outdoor festival show of a dramatization of the Ramona Allesandro legend. Many of the cast are, and purport to be, Indians. Any user of explosives contained as in a small grenade and disseminated over land, as would be the custom in a training range, must be guilty of a lack of care in returning such a range to the open countryside in an area where search for Indian relics is frequent, widespread, and inferentially invited. Children 8, 9 and 10 years of age, known as not the most mature in their grammar school classes, are certainly not to be held ineligible to the attractive nuisance doctrine in a jurisdiction where it has been carried to the extent common in California.[24] The plaintiffs here were very young children. They acted as children of the same ages, intelligence and experience would be expected to act. Their actions were within the realm of foreseeability, and they are not to be barred from recovery.

█ Plaintiff Alvy Parrott sustained six fractures, numerous lacerations and shock. Pieces of metal still remain in him. He will have some permanent limitation of motion in his right wrist and ankles. Neurological injuries, permanent in nature, will cause him some pain and disqualify him from many types of work. The Court assesses his damages at $30,000.

█ Plaintiff Walter Dwight Anthony suffered multiple punctuate wounds with nerve injuries some of which leave permanent numbness in his left hand. His body still contains shrapnel. His damages are fixed at $7,500.

█ Plaintiff Carlos Pat Anthony suffered injuries comparable in severity to those of his brother. He still has metal in his body, weakness in his left knee, and continued ringing in his ears. His damages are fixed at $7,500.

Plaintiff Joe Parrott, the father of Alvy Parrott, and plaintiff Jimmie Faye Anthony, the father of the Anthony boys, claim damages in the amount of medical expenses which they have incurred. Damages in the amount of $1,302.50 are allowed Joe Parrott. Damages in the amount of $409.50 are allowed Jimmie Faye Anthony.

Plaintiffs are directed to submit Findings of Fact, Conclusions of Law and Judgment.

---

24. See, e. g., Sandberg v. McGilvray-Raymond Granite Co., 1924, 66 Cal.App. 261, 226 P. 28; Prosser, Trespassing Children, 47 Calif.L.Rev. 427, 462–63 (1959); Comment, 46 Calif.L.Rev. 610, 615 (1958).