Christopher Shawn **DUVALL**, an infant by his father and next friend, Robert Wayland Duvall, and Robert Wayland Duvall, Plaintiffs,

v.

**UNITED STATES** of America, Defendant and Third-Party Plaintiff,

v.

Radford **TILLETT**, Third-Party Defendant.

Civ. A. No. 602.

United States District Court, E. D. North Carolina, Elizabeth City Division.

Feb. 9, 1970.

John H. Hall, Jr., Hall & Hall, Elizabeth City, N. C., William E. O'Neill, Jr., Ashcraft & Gerel, Washington, D. C., for plaintiffs.

W. Arnold Smith, Asst. U. S. Atty., Raleigh, N. C., for defendant.

Gerald F. White, Aydlett & White, Elizabeth City, N. C., for third-party defendant.

## OPINION AND ORDER

KELLAM, District Judge.

Pursuant to the provisions of the Federal Tort Claims Act, Title 28 § 1346(b), 2671, 2674, 2679, U.S.C.A., the infant plaintiff through his father and next friend instituted this action to recover from the United States damages for injuries sustained as the result of the explosion of a pyrotechnic Navy practice bomb. The parties stipulated that (a) the United States owns and exercises authority over the Naval Practice Bombing Range at Duck, North Carolina; (b) that all administrative procedures required by Title 28 § 2401(b) have been complied with; (c) all required notices have been given and reports made; and (d) that the injury complained of occurred February 19, 1967, at the residence of Radford Tillett, at Kitty Hawk, Dare County, North Carolina.

The Navy Practice Bombing Range (Range) at Duck, North Carolina, was acquired by the United States, in 1943, and was in active use for the training of Navy pilots until about 1965. Navy pilots from nearby bases flew over the Range and simulated bombing by the dropping of explosive pyrotechnic devices which emit smoke and flame upon detonation. The outer cast iron casing of the bomb does not ordinarily shatter from impact with the sandy target area. The Range is located on the sandy strip between the Currituck Sound on the west, and the Atlantic Ocean on the east, known as a part of the Outer Banks, much of which is made up of sand hills or dunes. While not now in active use by the government as a bombing range, the government still exercises authority and control over it. The area bounding the Range is sparsely settled, with the population to the north for some fifteen to twenty miles comprising only a few families. Except when bombing practice was actually being conducted, no effort was made to prevent any person from crossing or going upon the Range. The natives have always had what in reality is "free range" of the Outer Banks.[1] The strip between high and low water constituted their principal highway. One of the government witnesses, who had been stationed at the Range said tourists and others also regularly passed through the Range on the Sound Road (the road to the west of the ocean.)

The entire area, and particularly the Range, had always been known as a splendid place to find Indian relics. Frequent searches were conducted within the boundaries of the Range. Witnesses who often visited the Range said no effort was ever made to keep them from conducting searches for relics, except when bombing practices were in progress. Not only did the Navy know the Range was a splendid site for Indian relics, but testimony revealed that the Office of Naval Research, Department of the Navy, had sponsored an investigation of the area, including the Range, and the results of such research were published. In fact, in 1967 the local newspaper carried a story and picture of the father of the plaintiff, and referred to him as one who "hunts arrowheads as a hobby," and that he had located a "skeleton" while combing the sand dunes near the village of Duck. The story said the bones "may have been an Indian."

Some witnesses said that even while the Range was in active use, when actual bombing practice was not being conducted, they would ask and were granted permission by the Navy personnel to go

---

1. Whenever bombing practice was being conducted, guards were stationed at various places to prevent anyone from going upon the Range. Often a red flag was flown near the edge of the Ocean; at the north and south lines, with a large sign warning persons not to attempt to cross the Range when the flag was flying because bombing practice was being conducted. When practice ceased, no effort was made to prevent anyone from crossing or going upon the Range.

upon the Range; that often they would pick up bombs; that Navy personnel would look at at the bombs and permit them to carry them away; that no one tried to stop them from picking up the bombs or carrying them away; that the small bombs, like the one here in question, were frequently found on the lawns and in the homes of the people who lived nearby and collected them as souvenirs. Realizing that persons were roaming the area of the Range in search of Indian relics, and for other purposes, and also realizing the danger which existed, the Navy undertook about 1966 to "decontaminate" the Range. Many of the bombs and other objects were collected and piled in an area of the Range. But it appears many bombs were left. Following the occurrence of the injury to plaintiff, signs were prepared warning of the danger existing on the Range. While some signs had been posted before the accident, they were small, had fallen into disrepair or been removed.

In January, 1967, Radford Tillett drove his son Craig, who was then about ten years of age, and the infant plaintiff, his nephew, to Duck to search for Indian relics. They stopped some distance from the Range and roamed the sand dunes. He said they did not see any signs or other markings to mark the Range, although he knew it covered some part of the area. All agree it was not fenced. During their search he observed numerous of the "8 inch smoke bombs" on the sand dunes. He knew what they were, had seen the Navy planes drop them, and had seen them on people's lawns, gardens, in homes and other places, and knew they came from the Range. During the search the boys picked up several of the bombs. He agreed they might take one apiece, as he had "no reason to believe they were dangerous."

On February 19, 1967, the infant plaintiff, Christopher (Chris) was visiting the home of his cousin, Craig Tillett. While Craig and Chris were playing with the old bombs, one of them exploded and injured plaintiff. While playing with the bombs, Chris noticed a "shiny piece" of metal in one of the bombs. He tried to get the bomb apart to see what was in it. He did not know what was inside. While holding the bomb in his hand, he struck it against the concrete, causing it to explode in his hand. The blast caused severe and permanent injuries to plaintiff's left hand. Prior to the accident, plaintiff was left-handed.

The injury involved the severance of the index, middle and fourth fingers of plaintiff's left hand, damage to the muscular structure of the fifth (little finger), damage to the center of the hand, the palm and back of the hand. Skin grafts were made on the back of the hand, and other areas, from the skin of the abdomen. He was hospitalized from the date of the accident until March 4, 1967, and then confined to his home for some period of time, with his left hand and arm immobile and strapped to his abdomen while the skin graft became effective. He was again hospitalized from April 5th through 7th, 1967, and returned to the hospital again for surgery in June, 1968. The attending physician's evaluation of permanent injury sustained to the left hand was a range from seventy-five to ninety per cent of the loss of its use; that while what remains of the hand has grown normally since the surgical procedures, he could not say this normal growth will continue; that later, the boy may have trouble with the fifth (little) finger. There is a large scar on the abdomen from the skin graft, which may require future surgery. Plaintiff has become more nervous and has an emotional problem.

Congress has provided that in cases of this nature, the liability of the United States for tort claims shall be "in the same manner and to the same extent as a private individual under like circumstances." Title 28 § 2674 U.S.C.A. United States District Courts "have exclusive jurisdiction of civil actions on claims against the United States, for money damages * * * for * * * injury or death caused by the negligent or wrongful act or omission of any em-

ployee of the Government while acting within the scope of his office or employment, under circumstances when the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act of omission occurred." Title 28 § 1346(b). Venue is laid in Title 28 § 1402(b).

■ The accident occurred in North Carolina. Pursuant to the statute, the law of North Carolina will be applied in determining liability. Title 28 §§ 1346 (b), 2674. Murray v. United States, 329 F.2d 270 (4th Cir. 1964); United States v. Price, 288 F.2d 448 (4th Cir. 1961).

In Williamson v. Clay, 243 N.C. 337, 90 S.E.2d 727, at 731, the Supreme Court of North Carolina said, "[T]he law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence." And in Modern Electric Company v. Dennis, 255 N.C. 64, 120 S.E.2d 533, 539, the Court said, "[A]ctionable negligence is based upon the breach of a duty on the part of one person to exercise due care to protect another against injury, by failing to perform, or in the manner of performing, such duty, as a proximate result of which the latter sustains an injury. Due care being the care an ordinary prudent man would exercise under similar circumstances, and when charged with a like duty." Griffin v. Blankenship, 248 N.C. 81, 102 S.E.2d 451; Barnes v. Caulbourne, 240 N.C. 721, 83 S.E.2d 898.

■ What constitutes due care or proper care in one case may be gross negligence in another. The care to be exercised must be commensurate with the known danger, or commensurate with the dangerous character of the article. The "degree of care required of persons having the possession and control of dangerous explosives, is of the highest. The utmost caution must be used in their care and custody, to the

end that harm may not come to others upon coming in contact with them. The degree of care must be commensurate with the dangerous character of the article." Luttrell v. Carolina Mineral Co., 220 N.C. 782, 18 S.E.2d 412, 417, and cases cited therein; Belk v. Boyce, 263 N.C. 24, 138 S.E.2d 789, 794.

■ The degree of care to be exercised where children are or may be concerned is different from that owed to an adult. In Luttrell v. Carolina Mineral Co., supra, the Court said [18 S.E.2d 412, 417]:

"Though the extent of the precautions which a reasonably prudent person would take to avoid injury in the case of a child is affected by the child's appreciation of the danger incident to the handling of explosives, and hence, liability may exist in the case of a child of tender years which would not exist in the case of a child of more mature years, it is well settled that one who keeps or uses explosives owes a duty, especially to young children who cannot be expected to know and appreciate the danger, to exercise care commensurate with the danger to prevent injury to children who may have access to, or come in contact with, explosives. Thus it has been broadly stated that it is a breach of duty to leave or to store explosives accessible to children who are lawfully on the premises, or whose presence there should be anticipated. 22 Amer. Jur. 139. See, also Annotations in 43 A.L.R. 435, 49 A.L.R. 160 and 100 A.L.R. 452."

Again, in Tayloe v. Southern Bell Telephone & Telegraph Co., 258 N.C. 766, 129 S.E.2d 512, at 514, the Court said:

"To discard or leave a dynamite cap where either a child or an unversed adult might pick it up and cause it to explode is positive negligence. Both the common law and the statutes of North Carolina require persons having possession and control of dynamite to use the highest degree of care to

keep the explosives safe and secure and to guard others against injury from it. Only the highest degree of care is commensurate with the dangerous nature of dynamite."

When practice bombs of the type used are dropped, it must have been well known to the Navy some of them would not detonate. They knew the public frequented the Range. The Navy made no effort to prevent persons from going upon the Range. In fact, during the time it was in active use, it gave permission for persons to roam the Range. Persons were known to carry off the bombs. On some occasions the Navy personnel checked the bombs being carried off by the relic hunters and permitted them to carry them away. It seems to have been well understood that except during actual bombing practice, persons roamed the Range as they desired. It seems to have been the rule that persons in the communities collected the bombs from the Range—some of the same size as the one here, and some larger—and placed them in and about their homes and lawns.

The Navy recognized that danger existed from permitting the old bombs to remain scattered about the Range. In 1966, after the Navy had curtailed its use of the Range, it undertook to obtain an estimate of cost to clean up the area, in what it referred to as a "decontamination" of the area. It does not appear what happened to the preparation of the cost estimate, but some quantities of the bombs in the area were collected and piled with the idea of burying them. But the burial never took place, nor did the decontamination. Witnesses said quantities of the bombs were still spread over the area after the alleged decontamination. There can be no doubt the Navy was aware numerous live bombs were in the area. To be sure, they were not concerned with bombs which had already been exploded. In a communication of June, 1966 from the Commander, Fleet Air Norfolk, which is Defendant's Exhibit 2, relative to the Range, he requested that the area be adequately posted relative to the "presence of dangerous explosive materials." The above mentioned correspondence directed the property be "adequately posted," but the evidence is clear that at the time of the accident there was little posting of any kind, and what was there was not well maintained. But posting signs would not in and of themselves have excused the plain negligence existing in this case.

There is ample evidence in this case establishing that the government was negligent and that such negligence was a proximate cause of the injury to plaintiff. There are numerous decisions holding the Government liable under similar circumstances. See United States v. Stoppelmann, 266 F.2d 13 (8th Cir. 1959); Stewart v. United States, 186 F.2d 627 (7th Cir. 1951); Williams v. United States, 352 F.2d 477 (5th Cir. 1965); Parrott v. United States, 181 F. Supp. 425 (S.D.Cal.1960); Medlin v. United States, 244 F.Supp. 403 (W.D.S. C.1965); Beasley v. United States, 81 F.Supp. 518 (E.D.S.C.1948); Meara v. United States, 119 F.Supp. 662 (W.D. Ky.1954).

In Parrott v. United States, supra, the district court decided that upon lands once leased by the Government, it could be considered a "possessor" of land for purpose of attractive nuisance doctrine, and that it would be liable for injuries caused by explosives left upon its former leasehold. The property was released by the Government to its private owners in 1947 and the Government had been out of possession since that time. The accident and injury to the Parrott child and others occurred on February 12, 1957.

"The boys took the grenade home, and, after some futile attempts to take it apart, plaintiff Alvy Parrott threw it upon the pavement. It immediately exploded, inflicting various injuries, all serious, upon the three boys. Plaintiffs base their case upon the assertion that Army personnel failed to properly police or de-dub the firing range prior to its return to civilian use. The court finds that this is true.

'The risk incident to dealing with * * * explosive * * * matters * * * requires a great deal of care to be exercised. In other words, the standard of care required of the reasonable person when dealing with such dangerous articles is so great that a slight deviation therefrom will constitute negligence.' "

There too, as in this case, the area was known as a repository of Indian relics. The facts are much like those here. 181 F.Supp. at page 430, the opinion continues—

"However, as previously noted, the particular area was one well known as a repository of Indian relics. It had, in addition, a certain attraction to youngsters because of the normal residue of junk which is to be found on an abandoned military range. It was rural, unfenced, and of easy access."

In United States v. Stoppelmann, supra, at page 18 [266 F.2d 13, 18], in affirming an award against the United States for injuries sustained by a minor, who after Marine Corps maneuvers picked up unexploded live blank cartridges left on the ground and which were exploded by the firing of a BB pellet from an air rifle by plaintiff and others, the Court said:

"Certainly the negligence of defendant in leaving these dangerous explosives exposed and accessible to children and those of immature judgment with knowledge that they were so exposed constituted a substantial factor in bringing about plaintiff's injuries."

Stewart v. United States, supra, was an action to recover for damages to two minors against the United States under the provisions of the Tort Claims Act. The damages resulted from injuries sustained by boys from the explosion of a hand smoke grenade which had been a part of a stock of grenades maintained by the Army at Fort Sheridan, Illinois. Three high school boys entered the military reservation where there was a large sign posted on the roadway leading to the magazine area which read, "Danger Military Explosives. This Road Closed to Public Traffic." Another sign on the gate of the magazine enclosure read, "Keep out. No Smoking, No Matches, No Lighters Permitted in This Area." The three boys climbed the fence, obtained these grenades and one was left near the home of the injured boys. The Court held the government was liable and 186 F.2d at page 633 said:

"Turning to the instant situation, could the government reasonably have foreseen or anticipated that boys might enter the Magazine Area and remove grenades? A negative answer to this question requires a disclaimer of all knowledge of the proclivities possessed by the ordinary boy for discovery, exploration and the satisfaction of a curiosity oftentimes easily aroused. What could be more alluring or fascinating to a boy or group of boys, whether of tender or more mature age, than a pile of boxes in plain sight, labeled 'Fireworks'? Presented with a situation of such appealing nature they did what might reasonably be anticipated of normal boys—they climbed over the fence and carried away some of these dangerous instrumentalities. Such a result could have been readily foreseen by the exercise of reasonable diligence on the part of those in charge. The government argues that the three boys who took the grenades were trespassers at the time they entered the reservation. The record, however, does not support this contention. They were on the reservation, as they had been on previous occasions, and as other members of the public had been, with the implied and perhaps express consent of the government. True, when they scaled the fence and entered the Magazine Area they were trespassers, and by carrying away the grenades committed a theft, but the government cannot disclaim responsibility for such trespass because the boxes containing the grenades with their attractive labeling were in plain sight before and at the time the boys climbed the fence,

and the character of the fence, as already noted, was such as to present little if any obstacle to the boys' activities."

Plaintiff says that in addition to the duty imposed upon the government by the common law of North Carolina, that there is a statute defining the duty of any person handling or who has possession of explosives, namely:

"All persons having dynamite or other powerful explosives in their possession or under their control shall at all times keep such explosives in a safe and secure manner, and when such explosives are not in the course of being used they shall be stored and protected against theft or other unauthorized possession." G.S. § 14–284.1(c) (1967) Cum.Supp.)

█ █ The rule generally is that a violation of a statute enacted for safety and protection of the general public, such as the statute before us, is negligence per se. The Supreme Court of North Carolina has so held. Reynolds v. Murph, 241 N.C. 60, 84 S.E.2d 273 (1954). Thus, a person in North Carolina who has explosives under his control or in his possession must take adequate precautions to insure that no person, and especially children, are able to gain possession of these dangerous devices. If the person fails to take such precautions, under North Carolina law he is negligent.

█ The language of the Federal Tort Claims Act says the standards and tests of local law are to determine whether a negligent or wrongful act has been established which is actionable. Stewart v. United States, 186 F.2d 627 (7th Cir. 1951); Maryland v. United States, 165 F.2d 869 (4th Cir. 1947). The Federal Tort Claims Act makes the United States liable to injured parties to the same extent as a private party in a similar situation. Stewart v. United States, supra. A private person would be liable to an injured party to whom he owed a duty if he failed to take the proper precautions as required by the North Carolina statute cited above. Hence, plaintiff says that the North Carolina statute providing the manner and means to be employed in storing explosives is applicable to the United States.

Stewart v. United States, supra, so holds. In the Stewart case, plaintiff was injured from the explosion of a grenade which he found in a vacant lot adjacent to his home. The grenade had been removed from a magazine area of an Army military reservation by several high school boys who left them in the lot located near the plaintiff's residence. The magazine area of the reservation was accessible to the public. The perimeter fence had a large opening, where it was broken down, at a point near the magazine area. No sentry was posted at this opening. The State of Illinois, in which the plaintiff resided and in which the reservation was located, had several statutes which imposed a duty on the possessor or controller of explosives to take the proper precautions to store and maintain the explosives in a safe manner. The court in applying the Illinois safety statutes to the United States as the defendant found that the United States had failed to exercise the proper care demanded by the statutes and was therefore liable for negligence under the Federal Tort Claims Act.

Suggestion is made that the North Carolina statute is not applicable to the United States. We need not decide this issue, since there is ample evidence to establish negligence on the part of the United States, with or without the statute.

█ Defendant raised, but has not urged, the defense of contributory negligence. At the time plaintiff picked up the bomb from the Range and removed it to the home of his cousin he was not seven (7) years of age. At the time of injury he had become seven years of age by a little more than a week. Plaintiff was born February 7, 1960. In determining whether a child is guilty of contributory negligence in a given situa-

tion, the rule in North Carolina is set forth in Welch v. Jenkins, 271 N.C. 138, 155 S.E.2d 763, 766 (1967):

"An infant under 7 years of age is conclusively presumed to be incapable of contributory negligence. Walston v. Greene, 247 N.C. 693, 102 S.E.2d 124. An infant between the ages of 7 and 14 is presumed to be incapable of contributory negligence, but this presumption may be rebutted by evidence showing capacity. 'The test in determining whether the child is contributorily negligent is whether it acted as a child of its age, capacity, discretion, knowledge and experience would ordinarily have acted under similar circumstances.' Adams v. State Board of Education, 248 N.C. 506, 512, 103 S.E.2d 854, 858; accord, Wilson v. Bright, 255 N.C. 329, 121 S.E.2d 601; Hutchens v. Southard, 254 N.C. 428, 119 S.E.2d 205."

There is no evidence in this case to show that plaintiff possessed any knowledge of danger in dealing with explosives or "old bombs." Nor is there any suggestion from anyone that plaintiff had been told not to play with "old bombs," or not to go on the Range and collect them. In fact, his uncle was with him on the day he picked it up. The uncle's son was also along and was permitted to carry away one of the bombs. The child of tender years could have properly concluded that if his uncle saw no danger in his son's playing with one of the "old bombs" there would be no danger in plaintiff's playing with one. Plaintiff was not guilty of any negligence which in any way contributed to the accident.

Lastly, defendant says that the action should be dismissed because by application of the rule of "insulating negligence upon the facts of the case, no act committed or no lack of action by the defendant, United States of America, could be reasonably construed to be the proximate cause of the injuries complained of here." Defendant says that the negligence of· plaintiff's parents, and his un-

cle, Radford Tillett, in "placing within Chris' reach such devices was the proximate cause of the injuries complained of." First, there is no evidence either of Chris' parents knew he had picked up the bomb from the Range; nor is there evidence of any negligence on the part of Tillett. In Rundle v. Grubb Motor Lines, Inc., 300 F.2d 333, 339 (4th Cir. 1962), it is said:

"There is no basis here for applying the doctrine of the insulating negligence of a third party. The intervention of the negligence of such a third party must supersede entirely the negligence· of the defendant and produce the injury without the negligence of the defendant. Atlantic Greyhound Corp. v. McDonald, 125 F.2d 849 (4th Cir. 1942); Dickson v. Queen City Coach Co., 233 N.C. 167, 63 S.E.2d 297 (1951)."

In Atlantic Greyhound Corporation v. Hunt, 163 F.2d 117, 120 (4th Cir. 1947), cert. denied 332 U.S. 815, 68 S.Ct. 154, 92 L.Ed. 392, the Court said, "[T]his phrase of 'insulated negligence' seems established in North Carolina practice." Continuing, the Court said, "[T]his doctrine, which more ancient courts explained by differentiating condition and cause * * * is, in essence, nothing but a specific application of the theory of proximate cause." See also Whiteside v. Rooks, 197 F.Supp. 313, 316 (W.D.N.C.1961).

In Beasley v. United States, supra, the Court quoted the following passage from Ruling Case Law [81 F.Supp. 518, 525]:

"* * * It is universally agreed that the mere fact that the intervention of a responsible human being can be traced between the defendant's wrongful act, and the injury complained of will not absolve him. On the contrary the general rule is that whoever does a wrongful act is answerable for all the consequences that may ensue in the ordinary course of events, though such consequences are immediately and directly brought about by an intervening cause, if such

intervening cause was set in motion by the original wrongdoer, or was in reality only a condition on or through which the negligent act operated to produce the injurious result. Any number of causes and effects may intervene between the first wrongful cause and the final injurious consequence; and if they are such as might, with reasonable diligence have been foreseen, the last result, as well as the first, and every intermediate result is to be considered in law as the proximate result of the first wrongful cause. The question always is, was there any unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? The test is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies which might arise." 22 Ruling Case Law 134, 135, 136."

The evidence establishes that defendant was guilty of negligence which was a proximate cause of the accident and injury. There is no contributory negligence on the part of plaintiff, nor is there evidence to show that defendant's negligence is insulated by any negligence of any other person. Plaintiff is entitled to recover.

■ The nature of the plaintiff's injury is described above. At the time of injury he was just seven years old. More than two years elapsed between the time of the injury and trial of this case. The amount of pain and suffering already endured by plaintiff is severe. He will continue to have pain and suffering. By reasonable standards he will have 61.67 years of life left. His capacity to enjoy and participate in the opportunities, benefits, pleasures, experiences and advancements of life has been restricted. His right and opportunity to compete with others—as well he must—has now been reduced. Professional, mechanical, technical, social positions, privileges and opportunities which were available in unlimited quantities, have been greatly reduced. What may have been or what in the future might be his choice for earning a livelihood may now have to be altered. He has already experienced a personality change. He has and will continue to be embarrassed. Taking into consideration all of the facts and circumstances of the case and what is fair and just for the injuries received, the plaintiff is awarded the sum of $160,000.00.

Robert Wayland Duvall, father of Christopher Shawn Duvall, also seeks to recover for past treatment rendered the infant, and for future medical care. The sum of $1,700.30 has been paid out and/or incurred in medical expenses on behalf of the infant. While the evidence discloses that in all probability future surgery will be needed by Chris, the extent and cost are not sufficiently established to justify an award. Any amount awarded for such surgery would be purely speculative. Hence, Robert Wayland Duvall is granted judgment for said sum.

Pursuant to the provisions of Title 28 § 2678, Ashcraft and Gerel of Washington, D. C., and Hall and Hall of Elizabeth City, North Carolina, counsel for plaintiffs, are entitled to fees of twenty-five per cent of the amounts of the above recoveries for services rendered, to be paid out of the judgments rendered against the United States.

The United States filed a third-party complaint and a cross-claim against Radford Tillett. By agreement of all parties, "all actions and proceedings under the third-party complaint and/or the cross-claim or counter-claim of the United States shall be [were] held in abeyance pending a full determination of the plaintiffs' suits against the United States." [Order on final pretrial conference of August 13, 1969]. The United States is requested to review the evi-

dence and record in this case and advise within thirty days from this date whether it desires to further prosecute the third-party action and/or counter-claim or cross-claim.